IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JULIE GRAHAM, individually,
and on behalf of all others
similarly situated,

      Plaintiff,

v.                                                                                   Case No. 22-cv-00305-KG-GJF

BLUE CROSS AND BLUE SHIELD
of NEW MEXICO,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendant Blue Cross and Blue Shield of New

Mexico's (BCBSNM)[1] Motion to Dismiss (Doc. 25).  The Motion is fully and timely briefed.

(Docs. 27, 28, 29).   The Court, having considered the briefing and the applicable law, grants the

Motion in part and denies it in part.

I.    *Background*

In this case, Plaintiff Julie Graham alleges that BCBSNM unlawfully denied her requests

for necessary, out-of-state medical care.[2]  At root, the question presented is whether a Medicaid

---

[1] The Court previously held that BCBSNM is merely a trade name used by parent corporation
HCSC Insurance Services Company (HISC) and that BCBSNM is not a legally distinct entity
from HSIC.  (Doc. 24) at 5.  BCBSNM is the named party, however, and the Court will continue
to refer to Defendant as BCBSNM.

[2] Ms. Graham brought this action in state court and BCBSNM, as a foreign company, removed.
*See* Notice of Removal (Doc. 1).  The Court notes diversity jurisdiction and jurisdiction under
the Class Action Fairness Act, 28 U.S.C. 1332(d).  Memorandum Opinion and Order Denying
Motion to Remand (Doc. 24).

enrollee may bring claims against a Medicaid provider for the process by which it does, or does not, provide necessary medical services.

Under the Medicaid program, the federal government directs funding to states, including New Mexico, so that they may provide medical care to low-income individuals who would not otherwise be able to afford healthcare. *See generally* Medicaid Act, 42 U.S.C. § 1396 *et seq*. In exchange for these federal funds, the Medicaid Act requires that each state furnish healthcare services to all Medicaid-eligible citizens in compliance with numerous standards. *See generally* 42 U.S.C. §§ 1396a.

New Mexico, acting through its Human Services Department (HSD), opts to meet these requirements by contracting with private managed care organizations ("MCOs"), which arrange for delivery of healthcare services to individuals who enroll with them. Complaint (Doc. 1) at 16,[3] ¶¶ 31–32; *see also* 42 U.S.C. § 1396u-2 (authorizing and regulating MCOs); Medicaid Provider and Managed Care Act, NMSA § 27-11-1 *et seq.* (establishing New Mexico MCO scheme); 42 C.F.R. § 431.10 (2013) (requiring single state agency to administer state Medicaid program); New Mexico Public Assistance Act NMSA § 27-2-1 *et seq.* (creating Medicaid program generally and assigning HSD as sole administrator).

Under the terms of the "Medicaid Contract" between the state and several MCOs, each MCO is required to provide all medically necessary services that any Medicaid enrollee requires. (Doc. 1) at 17, ¶ 38; *see also* Medicaid Contract, *available at* (Doc. 25) Ex. A, (Doc. 27) Ex 1. MCOs accomplish this by negotiating contracts with service providers and creating an in-state network through which enrollees have access to care. *E.g.*, Medicaid Contract (Doc. 27-1) at §

---

[3] For clarity, when citing to the Complaint, the Court refers to the ECF-generated page numbers in the header of (Doc. 1) and not to any pagination original to the document.

4.5.1.2.  If an MCO cannot provide a particular medical service through its in-state network, then

it must arrange the care with an out-of-network provider.  (Doc. 1) at 18, ¶ 39; (Doc. 27-1) at §

4.5.1.2.  Medicaid-eligible New Mexicans must enroll with one of several MCOs offered in New

Mexico.  (Doc. 1) at 17, ¶ 36.

     In exchange for arranging healthcare services, an MCO receives from the state a fixed fee

based on the number of its enrollees.  (Doc. 1) at 21, ¶¶ 54–55; *see also* 42 C.F.R. § 438.2

(2016).  The MCO receives this recurring payment, akin to an insurance premium, regardless of

whether an enrollee receives services during a particular period.  42 C.F.R. § 438.2 (2016).  If

the total medical care provided costs less than the recurring payment, the MCO keeps the

difference, subject to certain limitations.  (Doc. 1) at 21, ¶ 55; (Doc. 27-1) at § 7.2.1.  The MCO,

however, must provide care even if the cost exceeds the recurring payment and the MCO takes a

loss.  (Doc. 27-1) at §§  6.1.4 and 6.2.2.  In this way, the state contracts for the provision of

medical services and also privatizes financial risk and establishes consistent costs for the

government.

     Defendant BCBSNM is one of these MCOs.  *Id.* at 16, ¶ 32.  HCSC Insurance Services

Company d/b/a BCBSNM contracts with the state of New Mexico via a Medicaid Managed Care

Services Agreement (the "Medicaid Contract").  *Id.* at 16, ¶¶ 32–33; *see also* (Doc. 25) Ex. A,

(Doc. 27) Ex. 1.  Ms. Graham is a Medicaid-eligible New Mexico resident who enrolled with

BCBSNM as her MCO for Medicaid coverage.  (Doc. 1) at 11.

     In this case, Ms. Graham alleges that she needed a particular surgery to treat acute

pancreatitis which was not available in New Mexico, and that BCBSNM improperly denied her

requests to procure the treatment in Virginia two different times.  *See generally* Complaint (Doc.

1).  But there is a plot twist.  BCBSNM did eventually approve Ms. Graham's care after she

3

invoked the state's fair hearing process. *Id.* This implicates one last important piece of

background: by statute and regulation, when a Medicaid member is denied care by an MCO, they

can appeal internally to the provider, (Doc. 1) at 20, ¶ 49, then can demand a fair hearing

conducted by the state, *id*. at 20, ¶¶ 51–52; 42 U.S.C. § 1396a(a)(3); NMSA § 27-3-3; NMAC

8.352.2.1 *et seq*., and finally can appeal in state district court, NMSA § 27-3-4; NMAC

8.352.2.20.  But because Ms. Graham did eventually get what she sought—approval of her

surgery—this action is not presented as an appeal of an adverse coverage decision.  Rather, it is a

collateral attack of sorts on the initial denials.

      Based on this unique set of circumstances, BCBSNM makes a blanket argument that Ms.

Graham fails to state a claim because BCBSNM did, eventually, approve her medical procedure

and therefore the appeals process worked as designed and no actionable claims have accrued.

(Doc. 25) at 2.  The Court rejects the argument that BCBSNM's eventual approval of care

relieves it of any possible liability for its conduct.  As Ms. Graham points out, the available

administrative appeals process only pertains to denial of care directly and does not provide a

remedy for allegedly unlawful procedures or business practices.  (Doc. 27) at 2.  Rather than

decide all at once that Ms. Graham has no viable action, the Court will consider each claim's

validity and applicability in turn.

      Broadly speaking, Ms. Graham's theory is that even though BCBSNM eventually

approved her care, its denials were unreasonable, frivolous, and in violation of state and federal

regulations.  *See Generally* Complaint (Doc. 1).  This behavior, Mr. Graham asserts, is part of a

pattern and practice of discouraging necessary medical care by unjustifiably denying

authorization and forcing insureds to appeal.  *Id.*  Ms. Graham alleges that BCBSNM,

furthermore, has a pattern and practice of reversing itself voluntarily before the state appeal to

avoid oversight from the state. *Id.* She seeks financial remedy in the form of compensatory damages, punitive damages, and costs and fees. *Id*. at 44. These claims lead to the central questions in this case: assuming her allegations are true, what legal recourse, if any, does Ms. Graham have to enforce BCBSNM's compliance with state and federal law? And moreover, does she have a legal avenue to seek monetary damages rather than injunctive or declaratory relief?

Ms. Graham attempts to find some legal footing by invoking the contract between BCBSNM and New Mexico, and by turning to state law causes of action ordinarily pertaining to the insurer-insured relationship. Her six claims are: (1) breach of contract (of the Medicaid contract between BCBSNM and the State of New Mexico); (2) breach of the covenant of good faith and fair dealing (also related to the Medicaid contract); (3) breach of fiduciary duty (to Ms. Graham directly); (4) violation of the New Mexico Insurance Code, § 59A-16-4, by misrepresentation of benefits, advantages, conditions, or terms of the policy; (5) violation of the New Mexico Insurance Code, § 59A-16-2-0, by misrepresentation of facts, bad faith failure to promptly handle claims, and failure to provide reasonable explanation of denial of care; and (6) violation of the New Mexico Unfair Practices Act. *Id*. at 32–39. Ms. Graham proposes a class action for similarly situated Medicaid recipients. *Id*. at 41.

For varied reasons, BCBSNM urges that each claim fails, opposing each with specific arguments and defenses explained fully in the analysis below. *See* (Doc. 25); *also infra* Section IV.

II.   *Legal Standard*

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In analyzing a Rule 12(b)(6) motion to dismiss, all "well-

pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Santa Fe Alliance for Public Health and Safety v. City of Santa Fe*, 993 F.3d 802, 811 (10th Cir. 2021) (internal citation omitted) *cert. denied sub nom. Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 142 S. Ct. 1228 (2022). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

If a plaintiff fails to allege an essential element of their claim, the complaint is appropriately dismissed pursuant to Rule 12(b)(6). *Ellis ex rel. Est. of Ellis v. Ogden City*, 589 F.3d 1099, 1102 (10th Cir. 2009). Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Iqbal*, 556 U.S. at 678. While "[s]pecific facts are not necessary," a complaint requires sufficient factual assertions to give the defendant notice of "the grounds upon which [the claim] rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).

In the context of a Rule 12(b)(6) motion to dismiss, "courts may consider not only the complaint itself, but also attached exhibits, . . . , and documents incorporated into the complaint by reference . . . ." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (internal citations omitted). In this case, the Court considers the Medicaid Contract, incorporated into the Complaint and selected portions attached as exhibits to the briefing by both parties, without converting the Motion to Dismiss to one for summary judgment.

III.    *The Allegations of the Complaint*

The Court draws the following allegations from the Complaint, available at (Doc. 1), and assumes they are true for the purpose of—and only for the purpose of—adjudicating the Motion to Dismiss.

Ms. Graham suffers from chronic pancreatitis, which grew more acute with time. (Doc. 1) at 22, ¶ 61. Her condition became severe enough that during 2019 and 2020 she was hospitalized 18 times, continuously medicated for severe pain, and placed on total parenteral nutrition—*i.e.* feeding via vein, usually a central line near the heart. *Id.* at 22–23, ¶ 62. Over 18 months, she lost 25 pounds. *Id.* Ms. Graham is a registered nurse, but she was hospitalized enough that she lost three different jobs and became Medicaid eligible. *Id.* at 23, ¶ 63. She enrolled with Defendant BCBSNM as her Medicaid MCO. *Id.*

In June 2020 Ms. Graham's doctors at the University of New Mexico hospital recommended a total pancreatectomy with islet cell autologous transplantation ("TP-IAT"). *Id.* at 23, ¶ 64. That specialized treatment was not available in New Mexico. *Id.* BCBSNM first recommended that Ms. Graham seek treatment in Texas, which it required she do at her own expense, and where her required care was in fact unavailable. *Id.* at 24, ¶¶ 66–68. Ms. Graham sought a second opinion at the Virginia Commonwealth University Health System ("VCU"), which confirmed she was a good candidate for the TP-IAT procedure and that it could perform the surgery there. *Id.* at 24, ¶ 69.

So, Ms. Graham requested pre-authorization for the surgery to be performed at VCU in Richmond. (Doc. 1) at 24, ¶¶ 70–71. Because BCBSNM was required to provide necessary care, including out-of-network services when not available in-state, Ms. Graham asserts she was entitled to authorization. *Id.* But BCBS denied her request. *Id.*

In its denial, BCBSNM, citing to its member handbook, reasoned that out-of-network care was not permitted except in emergency circumstances and, even then, care must be within 100 miles of the state border under New Mexico regulations. *Id.* at 25, ¶ 75. But this reasoning was erroneous. Ms. Graham submitted the request precisely for the purpose of seeking non-emergency prior approval, in compliance with the Member Handbook. *Id.* at 25–26, ¶¶ 76–77. And the New Mexico Administrative Code permits rather than forbids care beyond 100 miles of the border in necessary circumstances. *Id.* at 26, ¶ 78 (citing NMAC § 8.308.2.9). In these ways, the justification for denial of care was, according to Ms. Graham, false, misleading, and unreasonable. *Id.* at 26, ¶ 79.

Furthermore, the first denial was made by Dr. Aiden O'Rourke, a surgeon who is not a specialist in the treatment of pancreatitis. *Id.* at 27, ¶ 81. Dr. O'Rourke decided the denial despite the fact that, under the terms of the Medicaid Contract, denials must be made by a health care professional with clinical expertise in treating the particular condition involved. *Id.* at 19, ¶ 46; *see also* Medicaid Contract (Doc. 27-1) at § 4.12.12.4. Not to mention that Dr. O'Rourke made nonsensical recommendations—for example, suggesting using other surgeons in New Mexico and seeking care at the University of Colorado, none of whom performed the requested procedure. (Doc. 1) at 27, ¶ 82. Dr. O'Rourke evidently did not review Ms. Graham's medical records because her UNM doctors had noted her procedure was not available in New Mexico. *Id.* at 27, ¶ 83.

After the first denial, Ms. Graham's personal doctor once again requested she receive care at VCU, noting it was medically necessary and not available at UNM. *Id.* at 28, ¶ 84. Ms. Graham's doctor at VCU made the same request, noting the procedure was not available at the University of Colorado and that the situation was urgent. *Id.* at 28, ¶ 85. Ms. Graham filed a

second request for authorization, in the form of an internal appeal of the first denial.  *Id.* at 24, ¶ 72; 28, ¶ 86.

The internal appeal, the second request, was again denied.  *Id.* at 28, ¶ 87.  This time BCBSNM reasoned that "there is network adequacy for the delivery of this service," *id.*, and the surgery was not "medically necessary,"  *id.* at 29, ¶ 88, and, citing to the Member Handbook, concluded that the request did meet criteria for an "out-of-network" exception, *id.*  Once again, the reasoning was factually erroneous—there were no New Mexico providers available for the surgery.  *Id.* at 29, ¶ 89; *also id.* at 30, ¶ 94.  And the denial's citation to Member Handbook page 19 was unreasonable because nothing there addresses out-of-network care provision.  *Id.* at 31, ¶ 95.  Furthermore, the decision was once again procedurally deficient because it was made by Dr. David G. Williams, a family physician, not a clinical expert in pancreatic issues.  *Id.* at 30, ¶ 91.

Ms. Graham pursued her right to a fair hearing conducted by an administrative law judge from the state HSD.  *Id.* at 31, ¶ 96.  After the hearing had been convened, BCBS requested a recess, reversed course, and approved Ms. Graham's care.  *Id.* at 25, ¶ 74; 31, ¶¶ 96–98.  Because there was no longer an adverse decision to appeal, the fair hearing appeal was dismissed.  *Id.* at 31, ¶ 98.  Ms. Graham alleges that BCBSNM approved her care before an administrative law judge could adjudicate the dispute to avoid scrutiny from the state.  *Id.* at 25, ¶ 74; 32, ¶ 102.

One more allegation: BCBS must provide an ombudsman and explain how to contact them throughout the authorization process according to the terms of the Medicaid Contract.  *Id.* at 20, ¶ 53; *see also* Medicaid Contract (Doc. 27-1) at § 4.14.3.1.25.  But BCBSNM never provided Ms. Graham with one throughout this process.  (Doc. 1) at 23, ¶ 65.

Finally, Ms. Graham alleges that this behavior is not a one-off event, but rather indicative of a pattern and practice.  (Doc. 1) at 31–32, ¶¶ 99–102.

IV.    *Analysis*

The Court concludes that certain of the claims brought fail as matters of law while others survive dismissal.  The Court proceeds claim by claim.

A.    *The Contract Claims Fail Because Ms. Graham Is Not A Third-Party Beneficiary of the Medicaid Contract And Cannot Independently Enforce Its Terms*

Ms. Graham brings two claims based in contract law: in Count I she alleges breach of the Medicaid contract and in Count II she alleges breach of the covenant of good faith and fair dealing, also based in the Medicaid contract.  (Doc. 1) at 32–33.  BCBSNM raises three defenses to the contract claims.  First, it argues Ms. Graham is not an intended third-party beneficiary of the Medicaid contract and therefore cannot enforce it.  (Doc. 25) at 6–8.  Second, it argues that even if Ms. Graham could somehow bring suit under the contract, her claims are precluded because she did not exhaust required administrative remedies.  *Id.* at 8–9.  Third, it urges that Ms. Graham fails to state a contract claim generally.  *Id.* at 9–10.  The Court agrees on the first point: Ms. Graham does not show that she has standing to enforce the state's Medicaid contract as a third-party beneficiary.  Ms. Graham, therefore, fails to state a claim in Counts I and II of the Complaint.

In the first instance, this Court already has ruled on this issue.  In the context of Ms. Graham's Motion to Remand, the Court concluded that "Plaintiff is not a party to the [Medicaid] contract and is not an intended third-party beneficiary." (Doc. 24) at 8.  "Therefore, Plaintiff cannot enforce the forum selection clause." *Id.*  Ms. Graham construes that ruling as "not a final determination by the Court." (Doc. 27) at 18–19.  But the Court finds that its conclusion and reasoning at the jurisdictional stage carry equal weight now.

10

Indeed, as the Court already explained, (Doc. 24) at 8–9, the Medicaid contract contains a clear statement of intent to exclude third-party beneficiaries:

> No Third-Party Beneficiaries
> Only the parties to this Agreement, and their successors in interest and assigns, have any rights or remedies under, or by reason of, this Agreement.

(Doc. 25-1) at § 7.12.2.  On this point, Ms. Graham argues that the Court must allow extra-contractual discovery because "in an intended third-party beneficiary analysis…any extrinsic evidence available must also be considered."  (Doc. 27) at 19 (citing *Premier Tr. of Nevada, Inc. as Tr. of Murtagh Nevada Tr. v. City of Albuquerque*, 2021-NMCA-004, ¶ 28).  But the cited case creates no mandatory rule; rather, it states "a party may show intent to benefit by using extrinsic evidence *if the contract does not unambiguously indicate an intent to benefit him*." *Premier Tr. of Nevada*, 2021-NMCA-004, ¶ 27 (internal quotation marks and citation omitted) (emphasis added).  In this case, the contract does not leave any opening for unnamed beneficiaries.  Quite the opposite.  It unambiguously excludes them.  And New Mexico courts are clear that where third-party beneficiary language is explicit and unambiguous, no inquiry beyond the four corners of the contract is required.  *E.g.*, *Thompson v. Potter*, 2012-NMCA-014, ¶ 13 ("It is fundamental that if two contracting parties expressly provide that some third party who will be benefitted by performance shall have no legally enforceable right, the courts should effectuate the expressed intent by denying the third party any direct remedy.").

Here, the contract language is unambiguous: third-party enforcement is prohibited.[4]  For that reason, Ms. Graham fails to show standing to bring her contract claims.  Counts I and II

---

[4] Weighing in support of this view, in a similar case in this District, Judge Strickland recently considered the same Medicaid contract and also concluded that the No Third-Party Beneficiaries provision precluded Medicaid members from enforcing the contract. *See M.G., et al., v. Scrase, et al.*, No. 22-cv-00325-MIS-GJF, Doc. 77 at 6–8 (D.N.M. Oct. 27, 2022).

must be dismissed.  Having determined the third-party beneficiary issue is dispositive, the Court

does not address BCBSNM's remaining arguments related to these counts.  Because the contract

claims are precluded as a matter of law, the Court concludes that amendment would be futile and

dismisses them with prejudice.

       B.      *The Breach of Fiduciary Duty Claim Fails Because Ms. Graham Insufficiently*
                   *Alleges a Fiduciary Relationship*

In Count III, Ms. Graham alleges that BCBSNM breached its fiduciary duty to Ms.

Graham.  (Doc. 1) at 34.  BCBSNM contends that under New Mexico and federal law, it owed

no fiduciary duty to Ms. Graham because she and it were not in a relationship recognized as

giving rise to any duty.  (Doc. 25) at 15 (citing *Moody v. Stribling*, 1999-NMCA-094, ¶ 17

(collecting cases where duty recognized)).  Instead, it asserts that New Mexico contracted with

BCBSNM to satisfy the state's own fiduciary duty to its Medicaid-eligible residents.  *Id.*  Ms.

Graham responds that BCBSNM, as her insurer, clearly owed a fiduciary duty under New

Mexico law.  (Doc. 27) at 17–18 (citing, among other cases, *Allsup's Convenience Stores, Inc. v.

N. River Ins. Co.*, 1999-NMSC-006, ¶ 37).  But not all insurance relationships trigger a fiduciary

duty and not all adverse insurer actions breach such a duty.  *See Chavez v. Chenoweth*, 1976-

NMCA-076, ¶ 42.  The Court concludes that even if BCBSNM is properly deemed Ms.

Graham's insurer, she has not pled facts showing that it was her fiduciary or that it breached a

fiduciary duty.

       Whether a defendant owes a fiduciary duty to a defendant is a question of law.  *Moody v.

Stribling*, 1999-NMCA-094, ¶ 17.  New Mexico courts "recognize that a fiduciary duty or

confidential relationship can exist in a variety of contexts depending upon whether the

relationship between the parties is one of trust and confidence."  *Id.*  "A fiduciary relationship

exists in all cases where there has been a special confidence reposed in one who in equity and

12

good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence." *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999-NMSC-006, ¶ 37.

A fiduciary relationship can exist in the insurer-insured context, but not necessarily. When first addressing the question, the New Mexico Court of Appeals advised that "[s]omething more than the fact of the insurance relationship is required before a fiduciary relationship results." *Chavez*, 1976-NMCA-076, ¶ 42. For example, the Court explained, a fiduciary relationship exists where an insurance company has an affirmative obligation to represent or act on behalf of its insured, such when it has the power to determine whether to accept or reject a compromise offer, when it acts on behalf of the insured in litigation, and where it advises the insured whether to employ counsel. *Id.* ¶ 43 (citations omitted). In *Allsup's*, the case cited by Ms. Graham, the Court found a fiduciary relationship but only because under the unique terms of the "retrospective premium plan the insurer could largely determine the amount of premiums, whereby a certain trust was reposed in the insurer[.]" 1999-NMSC-006, ¶ 37.

In this case, the allegation is the BCBSNM denied an application for pre-authorization for surgery. This Court is not persuaded that this routine action fits the mold for a fiduciary responsibility. It is not akin, for example, to an insurer affirmatively electing to represent the insured's interests in litigation. And even if a fiduciary relationship existed, a denial of care decision is not necessarily indicative of any breach of a fiduciary duty. In the abstract, an insurer is allowed to deny authorization of treatment.

Because Ms. Graham does not allege conduct which creates a fiduciary obligation or which establishes a breach of a fiduciary duty under New Mexico law, the Court concludes that she fails to state a plausible breach of fiduciary duty claim. Count III is dismissed without prejudice.

C.     *Ms. Graham States Plausible Insurance Code Claims*

Ms. Graham brings two claims based in New Mexico's Unfair Insurance Practices Act:

Count IV alleges violation of the New Mexico Insurance Code, § 59A-16-4, by

misrepresentation of benefits, advantages, conditions, or terms of the policy; and Count V alleges

violation of § 59A-16-20 by misrepresentation of facts, bad faith failure to promptly handle

claims, and failure to provide reasonable explanation of denial of care.  (Doc. 1) at 27–29.

BCBSNM argues that the New Mexico Insurance Code claims fail because those

statutory claims do not apply to Medicaid.  (Doc. 25) at 11.  It contends that a detailed statutory

scheme governs Medicaid and that "the services and benefits to which Medicaid enrollees are

entitled arise by operation of state and federal law, not by the terms of individual insurance

contracts regulated by the New Mexico Insurance Code."  *Id.*  Specifically, New Mexico's

Public Assistance Act governs Medicaid and it includes an appeals process of which Ms.

Graham already availed herself.  *Id.* at 11–12.  And looking to the statute itself, Sections 59A-16-

4 and -20 apply to "insurance polic[ies]," which Ms. Graham did not have.  *Id.* at 12.

Ms. Graham, on the other hand, argues that BCBSNM ought to be considered an insurer

under state law and that state law is applicable to it.  (Doc. 27) at 5.  An MCO must, for example,

submit to the New Mexico Superintendent of Insurance acting as its attorney for service of

process.  *Id.* (citing NMSA §§ 59A-5-31 and -32).  She also pleads that BCBSNM holds itself

out as an insurance company to the public and by terms of the Medicaid contract.  (Doc. 1) at 19,

¶ 45.  Among a litany of other reasons, Ms. Graham asserts that BCBSNM is an insurer because

MCOs receive premium payments from the state and accept the risk of providing medical care,

*id.* at 6–8, and because when Medicaid enrollees transfer to an MCO from their prior health

insurance, the MCO is required to provide uninterrupted care, (Doc. 27) at 6–7 (citing (Doc. 27-

1) at § 4.4.17.1).  She also points out that the Medicaid appeals scheme available to members only pertains to denials of benefits and does not provide recourse for an MCO's allegedly unlawful conduct.  (Doc. 27) at 10.

Although the dismissal standard ordinarily tests the complaint and not the proponent's motion, in this instance BCBSNM make affirmative legal arguments that the insurance claims are inapplicable to it, and the Court concludes it has not carried its burden of persuasion on those legal arguments.

*First*, the Court is not persuaded by BCBSNM's argument that the New Mexico Insurance Code is inapplicable to Medicaid MCOs.  BCBSNM has not shown that federal law preempts all state law and is the exclusive source of causes of action against private Medicaid MCOs, nor that the New Mexico Public Assistance Act is the sole source of legal remedy under state law.  Medicaid represents "cooperative federalism."  *See, e.g.*, *Wisconsin Dep't of Health & Fam. Servs. v. Blumer*, 534 U.S. 473, 495 (2002).  The federal government provides funding and sets certain standards, but it has not taken the field entirely; states also provide funding and have agency to regulate their Medicaid programs and negotiate the contracts they sign with MCOs.  In this case, the Medicaid contract governing BCBSNM's business in New Mexico incorporates both state and federal law without limitations:  "[BCBSNM] agrees to comply with all applicable federal and State statutes, rules and regulations, policies, consent decrees, executive orders and court orders, including Constitutional provisions regarding due process and equal protection of the law, including but not limited to…."  (Doc. 27-1) at § 7.5;[5] *see also id.* at § 4.12.10.1.6 (requiring BCBSNM to comply with New Mexico Health Insurance Prior Authorization Act); *id.*

---

[5] The Court notes that BCBSNM did not include this section in the portions of the Medicaid Contract it attached, and Ms. Graham did not include the next page which, ostensibly, contains the alluded-to list of authorities.

at § 4.14.3.1.17 (requiring BCBSNM to comply with New Mexico Mental Health Care

Treatment Decisions Act).

Moreover, judicial interpretation support the conclusion that state laws apply to Medicaid

MCOs.  For example, the New Mexico Court of Appeals has held that a New Mexico Unfair

Practices Act claim brought by enrollees against a Medicare provider was not preempted by

federal law and could proceed.  *Palmer v. St. Joseph Healthcare P.S.O., Inc.*, 2003-NMCA-118,

*cert. dismissed*, 2004-NMCERT-010, 101 P.3d 808.  There, it reasoned that

> if Plaintiffs' claims are dismissed because they are preempted, Plaintiffs have no
> remedy. We agree with the view of the United States Supreme Court that Congress
> does not intend to cavalierly preempt state law causes of action, and that it would
> be "difficult to believe that Congress would, without comment, remove all means
> of judicial recourse for those injured by illegal conduct." *Medtronic, Inc.*, 518 U.S.
> at 487, 116 S.Ct. 2240 (internal quotation marks and citation omitted).

*Id.* ¶ 51.  In this district, Judge Browning has also previously ruled that federal Medicare law

does not preempt state law claims against Medicare providers.  *See Olsen v. Quality Continuum*

*Hospice, Inc.*, 380 F.Supp.2d 1225, 1232 (D.N.M. 2004).

Additionally, New Mexico's Unfair Insurance Practices Act states that it was passed in

accordance with "the intent of Congress." § 59A-16-2 (citing 15 U.S.C. § 1011–1015).  The

cited federal law leaves the regulation of insurance to the states and explicitly notes that "[n]o

Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any

State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon

such business, unless such Act specifically relates to the business of insurance[.]"  15 U.S.C. §

1012.  BCBSNM has cited to no authority showing that Congress intended in the Medicaid Act

to preempt state insurance schemes.

*Second*, the Court also is not persuaded that BCBSNM, though it did not have an

insurance contract directly with Ms. Graham, is not an insurer.  As Ms. Graham points out,

16

MCOs functionally behave as insurers, stepping into the place of private insurance when enrollees become Medicaid-eligible, and accepting premium payments (from the state) in return for spreading risk and assuming responsibly for covering medical care. At the very least, BCBSNM had the power in this instance to approve or deny coverage of Ms. Graham's care, a position which is akin to an insurer and from which an MCO could manifest conduct meant to be prohibited by New Mexico's Insurance Code. *See, e.g.*, NMSA § 59A-16-20 (defining unfair claims practices).

Furthermore, though BCBSNM argues that the text of the Insurance Code shows it applies only to insurance policies, (Doc. 25) at 12, the Court notes that the Unfair Insurance Practices Act has a liberal definition of "insurers" to which it applies. That definition includes things like "nonprofit health care plans" and "health maintenance organizations" and "all other persons engaged in any business which is now or hereafter subject to the superintendent's supervision under the Insurance Code[.]" § 59A-16-1. As Ms. Graham points out, the Medicaid Contract at least requires MCOs like BCBSNM to submit to service of process via the Superintendent of Insurance. (Doc. 27) at 5. Whether BCBSNM is an insurer under the statute is a mixed question of fact and law that needs to be developed and argued further. But for now, the Court determines the New Mexico Insurance Code plausibly applies to BCBSNM.

*Third*, the Court is not persuaded that the existence of an administrative appeals process forbids any other legal action against an MCO. As the Court already addressed in Section I, and as Ms. Graham has repeatedly pointed out, the Medicaid appeals scheme available to members only pertains to adverse benefits decisions and does not provide remedy for an MCO's allegedly unlawful conduct. (Doc. 27) at 10. So, the Court is not persuaded to rule that the Insurance Code claims are absolutely precluded.

Putting the burden back on the Complaint, the Court concludes Ms. Graham has pled sufficient facts and a reasonable enough legal theory to state a plausible claim.  Far from conclusory allegations, she pleads specific facts detailing procedural and substantive issues with her authorization requests.  The pleading is more than sufficient to plausibly state that BCBSNM has misrepresented terms in violation of § 59A-16-4 and has employed unfair or deceptive practices regarding claims in violation of § 59A-16-20.  This suffices to survive the 12(b)(6) standard.

BCBSNM argues that the § 59A-16-4 claim fails because Ms. Graham did not allege a pre-enrollment advertisement nor any misrepresentation.  But the Court finds the argument unavailing because it does not read the statute to require an advertisement in any strict sense, nor that a misrepresentation be pre-enrollment.  *See* NMSA §§ 59A-16-4.  Instead, the statute prohibits misrepresentations about "the benefits, advantages, conditions or terms of any policy," § 59A-16-4(A),  and forbids any failure to disclose material facts, § 59A-16-4 (G).

For all these reasons, the Court denies the Motion with regard to the Insurance Code claims in Counts IV and V.

D.    *Unfair and Deceptive Practices*

Ms. Graham alleges BCBSNM violated the Unfair Trade Practice Act, NMSA § 57-12-1 *et seq.*, by making a statement which tends to or does deceive or mislead any person, (Doc. 1) at 39, ¶ 139 (citing § 57-12-2(D)), and by taking advantage of a person with a lack of knowledge or by creating a gross disparity between the value received and the price paid, *id.* at 39, ¶ 140 (citing § 57-12-2(E)).  BCBSNM argues, in short, that it did not sell Ms. Graham any goods or services, and no contract, unconscionably unfair or otherwise, created a relationship between them.  (Doc. 25) at 16.  Ms. Graham responds, among other arguments, that the Unfair Trade

18

Practices Act is a remedial act which must be construed liberally to effectuate its purposes, (Doc.

27) at 13 (citing *Yazzie v. Amigo Chevrolet, Inc.*, 189 F.Supp.2d 1245 (D.N.M. 2001)).

The Court disagrees with BCBSNM that the Unfair Practices Act requires such a strict

view of the commercial relationship between the claimant and defendant.  The Act requires that a

misrepresentation be "made *in connection* with the sale… of goods or services[.]" § 57-12-2(D)

(emphasis added).  New Mexico courts have interpreted that to mean that "a commercial

transaction between a claimant and a defendant need not be alleged in order to sustain a [Unfair

Practices Act] claim." *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100,  ¶ 33.  In so

holding, the Court reasoned that the plain language of the law does not require "a

misrepresentation *in the course of* a sale between plaintiff and defendant" but merely in

connection with it generally.  *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 30

(emphasis in original).  It also reasoned that the Unfair Practices Act must be applied liberally to

meet its remedial purpose.  *Id.* ¶ 31.

Here, the denial of care may not have involved a payment directly from Ms. Graham to

BCBSNM but it was surely made in connection with the sale of services in the regular course of

BCBSNM's business.  *See* NM UJI 13-2501. The denial was made in connection to the sale of

services in two ways. First, BSBNM was paid by the state to provide care to Ms. Graham, and it

was in connection to that sale of its services that BCBSNM made its denial decision.  And

second, by denying care, BCBSNM refused to pay for a medical service.  The Court additionally

determines that the policy of liberal interpretation dictates that an unusual business model—in

which the state pays for the service rather than the enrollee directly—ought not preclude a

Medicaid enrollee from bringing an Unfair Practices Act claim against her MCO.

19

Finding the arguments against the Unfair Practices Act claim unavailing, the Court otherwise determines Ms. Graham states a plausible claim and denies the Motion relative to Count VI.

V.      *Conclusion*

The Court grants the Motion to Dismiss (Doc. 25) in part, dismisses Counts I and II with prejudice as legally barred, dismisses Count III without prejudice for failure to state a claim, and otherwise denies the Motion in part as to the remaining Counts.

IT IS SO ORDERED.

UNITED STATES DISTRICT JUDGE