## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

———————————————

JULIE GRAHAM,

    Plaintiff,

        vs.                                No. 1:22-CV-00305-KG-GJF

BLUE CROSS AND BLUE SHIELD
OF NEW MEXICO**,**

    Defendant.

## ORDER DENYING PLAINTIFF'S MOTION TO CERTIFY AND GRANTING IN PART DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS

    **THIS MATTER** is before the Court on Plaintiff Julie Graham's Motion for Certification to the New Mexico Supreme Court (**Doc. 62**), and Defendant Blue Cross and Blue Shield of New Mexico's (BCBSNM)[1] Cross-Motion for Judgment on the Pleadings (**Doc. 64**). These Motions are fully and timely briefed (**Docs. 62, 64, 66, 67, 70**). The Court, having considered the briefing and applicable law, **DENIES** Ms. Graham's Motion for Certification (**Doc. 62**), and **GRANTS in part** BCBSNM's Cross-Motion for Judgment on the Pleadings (**Doc. 64**), as set forth in more detail below.

———————————————

[1] The Court previously held that BCBSNM is merely a trade name used by parent corporation HCSC Insurance Services Company (HISC) and that BCBSNM is not a legally distinct entity from HISC. (**Doc. 24**) **at 5**. BCBSNM is the named party, however, and the Court will continue to refer to Defendant as BCBSNM.

## BACKGROUND

In this case, Plaintiff Julie Graham alleges that BCBSNM unlawfully denied her requests for necessary, out-of-state medical care under the Medicaid Program.[2]

### I.    The Medicaid Program:

Under the Medicaid program, the federal government directs funding to states, including New Mexico, so that they may provide medical care to low-income individuals who would not otherwise be able to afford healthcare. *See generally* Medicaid Act, 42 U.S.C. § 1396 *et seq.*  In exchange for these federal funds, the Medicaid Act requires that each state furnish healthcare services to all Medicaid-eligible citizens in compliance with numerous standards.  42 U.S.C. § 1396(a).

New Mexico, acting through its Human Services Department ("HSD"), opts to meet these requirements by contracting with private managed care organizations ("MCOs"), which arrange for delivery of healthcare services to individuals who enroll with them.  Complaint **(Doc. 1) at 16, ¶¶ 31–32**; *see also* 42 U.S.C. § 1396u-2; Medicaid Provider and Managed Care Act, NMSA § 27-11-1 *et seq.* (establishing New Mexico MCO scheme); 42 C.F.R. § 431.10 (2013) (requiring single state agency to administer state Medicaid program); NMSA 1978, § 27-2-1 *et seq.* (creating Medicaid program generally and assigning HSD as sole administrator).

Under the terms of the "Medicaid Contract" between the state and several MCOs, each MCO must provide all medically necessary services to the Medicaid enrollee.  **(Doc. 1) at 17, ¶ 38; (Docs.  25-1, 27-1)**.  MCOs accomplish this by negotiating contracts with service providers and creating an in-state network through which enrollees have access to care**.  *E.g.,* (Doc. 27-1)**

---

[2] Ms. Graham brought this action in state court and BCBSNM, as a foreign company, removed.  *See* Notice of Removal (**Doc. 1**).  The Court notes diversity jurisdiction and jurisdiction under the Class Action Fairness Act, 28 U.S.C. 1332(d).  Memorandum Opinion and Order Denying Motion to Remand (**Doc. 24**).

at § 4.5.1.2. If an MCO cannot provide a particular medical service through its in-state network, then it must arrange for care with an out-of-network provider. **(Doc. 1) at 18, ¶ 39; (Doc. 27-1) at § 4.5.1.2.** Medicaid-eligible New Mexicans must enroll with one of several MCOs offered in New Mexico. **(Doc. 1) at 17, ¶ 36.**

In exchange for arranging healthcare services, an MCO receives from the state a fixed fee based on the number of its enrollees. **(Doc. 1) at 21, ¶¶ 54–55.** The MCO receives this recurring payment, akin to an insurance premium, regardless of whether an enrollee receives services during a particular period. 42 C.F.R. § 438.2 (2016). If the total medical care provided costs less than the recurring payment, the MCO keeps the difference, subject to certain limitations. **(Doc. 1) at 21, ¶ 55; (Doc. 27-1) at § 7.2.1.** The MCO, however, must provide care even if the cost exceeds the recurring payment and the MCO takes a loss. **(Doc. 27-1) at §§ 6.1.4 and 6.2.2.** In this way, the state contracts for the provision of medical services, privatizes financial risk, and establishes consistent costs for the government.

## II.    Ms. Graham's Lawsuit Against BCBSNM:

On March 21, 2022, Ms. Graham filed the instant action in the First Judicial District Court of New Mexico, alleging the following six claims against BCBSNM: **(I)** breach of contract (of the Medicaid contract between BCBSNM and the State of New Mexico); **(II)** breach of the covenant of good faith and fair dealing (also related to the Medicaid contract); **(III)** breach of fiduciary duty (to Ms. Graham directly); **(IV)** violation of the New Mexico Insurance Code, NMSA 1978, § 59A-16-4, by misrepresentation of benefits, advantages, conditions, or terms of the policy; **(V)** violation of the New Mexico Insurance Code, NMSA 1978, § 59A-16-2, by misrepresentation of facts, bad faith failure to promptly handle claims, and failure to provide reasonable explanation of denial of care; and **(VI)** violation of the New Mexico Unfair Practices

Act, NMSA 1978, §§ 57-12-2(D), (E), 57-12-3. (**Doc. 1**) **at 32–39**. Ms. Graham also proposes a

class action for similarly situated Medicaid recipients. *Id.* **at 41**. Subsequently on April 22,

2022, BCBSNM removed the action to Federal Court.

### III.    The Allegations of the Complaint:

The Court draws the following allegations from the Complaint (**Doc. 1**), and assumes

they are true for the purpose of adjudicating the Motion for Certification and Motion for

Judgment on the Pleadings.

Ms. Graham suffers from chronic pancreatitis, which grew more acute with time. (**Doc.

1**) **at 22, ¶ 61**. Her condition became severe enough that during 2019 and 2020 she was

hospitalized eighteen times, continuously medicated for severe pain, and placed on total

parenteral nutrition – *i.e.*, feeding via vein, usually a central line near the heart. *Id.* **at 22–23**, ¶

**62**. Over 18 months, she lost twenty-five pounds. *Id.* Ms. Graham is a registered nurse, but she

was hospitalized enough that she lost three different jobs and became Medicaid eligible. *Id.* **at

23**, ¶ **63**. She enrolled with Defendant BCBSNM as her Medicaid MCO. *Id.*

In June 2020 Ms. Graham's doctors at the University of New Mexico hospital

recommended a total pancreatectomy with islet cell autologous transplantation ("TP-IAT"). *Id.*

**at 23**, ¶ **64**. That specialized treatment was not available in New Mexico. *Id.* BCBSNM first

recommended that Ms. Graham seek treatment in Texas, which it required she do at her own

expense, and where her required care was in fact unavailable. *Id.* **at 24**, ¶¶ **66–68**. Ms. Graham

sought a second opinion at the Virginia Commonwealth University Health System ("VCU"),

which confirmed she was a good candidate for the TP-IAT procedure and that it could perform

the surgery there. *Id.* **at 24**, ¶ **69**.

So, Ms. Graham requested pre-authorization for the surgery at VCU in Richmond. *Id.* **at

24, ¶¶ 70–71**. Because BCBSNM was required to provide necessary care, including out-of-

network services when not available in-state, Ms. Graham asserts she was entitled to authorization. *Id.* But BCBSNM denied her request. *Id.*

In its denial, BCBSNM, citing to its member handbook, reasoned that out-of-network care was not permitted except in emergency circumstances and, even then, care must be within one hundred miles of the state border under New Mexico regulations. *Id.* **at 25, ¶ 75**. But this reasoning was erroneous. Ms. Graham submitted the request precisely for the purpose of seeking non-emergency prior approval, in compliance with the Member Handbook. *Id.* **at 25–26, ¶¶ 76– 77**. And the New Mexico Administrative Code permits, rather than forbids, care beyond one hundred miles of the border in necessary circumstances. *Id.* **at 26, ¶ 78 (citing NMAC § 8.308.2.9)**. In these ways, the justification for denial of care was, according to Ms. Graham, false, misleading, and unreasonable. *Id.* **at 26, ¶ 79**.

Furthermore, Dr. Aiden O'Rourke, a surgeon who is not a specialist in the treatment of pancreatitis, made the first denial. *Id.* **at 27, ¶ 81**. Dr. O'Rourke decided the denial even though, under the terms of the Medicaid Contract, denials must be made by a health care professional with clinical expertise in treating the condition involved. *Id.* **at 19, ¶ 46;** ***see also*** **(Doc. 27-1) at § 4.12.12.4**. Not to mention that Dr. O'Rourke made recommendations that were inconsistent with BCBSNM's stated reasons for denial – for example, seeking care at the University of Colorado and suggesting using other surgeons in New Mexico, none of whom performed the requested procedure. *Id.* **at 27, ¶ 82**. Dr. O'Rourke did not review Ms. Graham's medical records because her UNM doctors had noted her procedure was not available in New Mexico. *Id.* **at 27, ¶ 83**.

After the first denial, Ms. Graham's personal doctor once again requested she receive care at VCU, noting it was medically necessary and not available at UNM. *Id.* **at 28, ¶ 84**. Ms. Graham's doctor at VCU made the same request, noting the procedure was not available at the

University of Colorado and that the situation was urgent. *Id.* **at 28, ¶ 85**. Ms. Graham filed a

second request for authorization, in the form of an internal appeal of the first denial. *Id.* **at 24, ¶**

**72; 28, ¶ 86**.

BCBSNM again denied the internal appeal. *Id.* **at 28, ¶ 87**. This time BCBSNM

reasoned that "there is network adequacy for the delivery of this service," *id.*, and the surgery

was not "medically necessary," *id.* **at 29, ¶ 88**, and, citing to the Member Handbook, concluded

that the request did meet criteria for an "out-of-network" exception, *id.* Once again, the

reasoning was factually erroneous—there were no New Mexico providers available for the

surgery. *Id.* **at 29, ¶ 89; 30, ¶ 94**. And the denial's citation to Member Handbook page 19 was

unreasonable because nothing there addresses out-of-network care provision. *Id.* **at 31, ¶ 95**.

Furthermore, the decision was once again procedurally deficient because Dr. David G. Williams,

a family physician—not a clinical expert in pancreatic issues—made the decision. *Id.* **at 30, ¶**

**91**.

Ms. Graham pursued her right to a fair hearing conducted by an administrative law judge

from the state HSD. *Id.* **at 31, ¶ 96**. After the hearing convened, BCBSNM requested a recess,

reversed course, and approved Ms. Graham's care. *Id.* **at 25, ¶ 74; 31, ¶¶ 96–98**. Because there

was no longer an adverse decision to appeal, the fair hearing appeal was dismissed. *Id.* **at 31, ¶**

**98**. Ms. Graham alleges that, to avoid scrutiny from the state, BCBSNM approved her care

before an administrative law judge could adjudicate the dispute. *Id.* **at 25, ¶ 74; 32, ¶ 102**.

### IV.    BCBSNM's Rule 12(b)(6) Motion to Dismiss:

On February 28, 2023, BCBSNM moved to dismiss all of Ms. Graham's claims against it

pursuant to Rule 12(b)(6). (**Doc. 25**).

The Court ultimately ruled in Ms. Graham's favor on the New Mexico Trade and Fraud

Practices Act (TFPA) and the Unfair Trade Practices Act (UPA) claims. (**Doc. 32**) **at 14–20**. It

rejected BCBSNM's argument that federal law preempted Ms. Graham's TFPA claims and that the New Mexico Public Assistance Act provided the sole remedy for private Medicaid MCOs. *Id.* **at 15–16** (citing *Palmer v. St. Joseph Healthcare P.S.O., Inc.*, 2003-NMCA-118, ¶ 51, and *Olsen v. Quality Continuum Hospice Inc.*, 380 F. Supp. 2d 1225, 1232 (D.N.M. 2004)).

The Court also disagreed with BCBSNM's assertion that it was not an insurer simply because it lacked a direct insurance contract with Ms. Graham. *Id.* Instead, the Court found that MCOs function like insurers by assuming financial risk, receiving state premium payments, and making coverage determinations—actions akin to those of insurers. *Id.* **at 16–17**.

Regarding Ms. Graham's UPA claims, the Court rejected BCBSNM's argument that the UPA requires a strict commercial relationship between the claimant and the defendant. *Id.* **at 19**. Citing *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶¶ 30, 31, 33, the Court emphasized that the law does not require a direct sale between the plaintiff and defendant, only that the misrepresentation occurred "in connection with" a sale. *Id.*

Following the Court's Order on BCBSNM's Motion to Dismiss, Ms. Graham filed a Motion for Certification (**Doc. 62**). BCBSNM opposed the motion and filed a Cross-Motion for Judgment on the Pleadings (**Doc. 64**).

## **DISCUSSION**

Ms. Graham's Motion for Certification and BCBSNM's Cross-Motion for Judgment on the Pleadings revisit many of the same questions raised in BCBSNM's Motion to Dismiss: Does the TFPA apply to MCOs? Is an MCO considered an insurer? Is a Medicaid enrollee an insured under the TFPA? Does a Medicaid contract between the State of New Mexico and an MCO qualify as a policy under the TFPA? And did BCBSNM engage in any unfair trade practice or unconscionable behavior in connection with the sale, lease, rental, or loan of goods or services?

The Court addresses each of these questions below, along with whether certification to the Supreme Court of New Mexico is necessary.

**I.    Relevant Law:**

Before addressing the parties' arguments and questions, the Court sets forth the legal standards for Fed. R. Civ. P. 12(c) motions for judgment on the pleadings and certification to the New Mexico Supreme Court.

**A.  Law Regarding Fed. R. Civ. P. 12(c) Motion for Judgment on the Pleadings:**

Under Fed. R. Civ. P. 12(c), "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."  Pursuant to Fed. R. Civ. P. 7(a), pleadings close upon the filing of a complaint and answer, unless a counterclaim, cross-claim, or third-party claim is interposed.

The Court reviews a Rule 12(c) motion for judgment on the pleadings under the same legal standard as a motion for failure to state a claim made under Fed. R. Civ. P. 12(b)(6).  *See Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000) ("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)."); *Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 528 (10th Cir. 1992) (same).

To survive a Rule 12(b)(6) motion, "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).  That is, a complaint must include "enough facts to state a claim for relief that is plausible on its face." *TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1235 (10th Cir. 2007).  "A claim has facial plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Moreover, a Rule 12(c) motion for "[j]udgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved, and the party is entitled to judgment as a matter of law.'" *Park Univ. Enters., Inc. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006) (citation omitted). In other words, a motion for a judgment on the pleadings "only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court." *Ciber, Inc. v. ACE Am. Ins. Co.*, 261 F. Supp. 3d 1119, 1125 (D. Colo. 2017) (quoting 5C Charles Alan Wright et al., *Federal Practice & Procedure* § 1367 (3d ed., Apr. 2019 update)).

Finally, BCBSNM filed a Rule 12(c) motion for judgment on the pleadings after the Court denied BCBSNM's Rule 12(b)(6) motion to dismiss as to Ms. Graham's claims under the TFPA and UPA. Although the motions are subject to the same legal standards, a party can move for judgment on the pleadings following the denial of a 12(b)(6) motion to dismiss.[3]

### B. Law Regarding Certification to the New Mexico Supreme Court:

Rule 12-607(1) NMRA outlines the conditions under which the New Mexico Supreme Court may answer a question of law certified to it by a federal court:

> The Supreme Court may answer by formal written opinion, questions of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and the question is one for which answer is not provided by a controlling appellate opinion of the New Mexico Supreme Court or the New Mexico Court of Appeals; or constitutional provision or statute of this state.

---

[3] *Fortinet, Inc. v. Forescout Techs., Inc.*, 730 F. Supp. 3d 958, 963 (N.D. Cal. 2024) ("A motion under Rule 12(c) may be brought after denial of a motion to dismiss under Rule 12(b)."); *Saraswati v. Cnty. of San Diego*, 2009 WL 10726522, at *3 (S.D. Cal.) (same); *Taylor v. Bettis*, 976 F. Supp. 2d 721, 734 (E.D.N.C. 2013) (same); *Preimesberger v. United States*, 541 F. Supp. 3d 1046, 1051 (E.D. Cal. 2021) (holding that a motion for judgment on the pleadings filed after a motion to dismiss was not an impermissibly filed motion for reconsideration).

Beyond requiring that the certified question be determinative of the pending case and unresolved by any controlling appellate decision, constitutional provision, or state statute, the New Mexico Supreme Court also considers whether the certified question involves factual disputes, presents a matter of substantial public interest, carries a significant degree of legal uncertainty, and serves judicial economy. *Schlieter v. Carlos*, 1980-NMSC-037, ¶ 5, 108 N.M. 507, 508, 775 P.2d 709 (citations omitted).

While the New Mexico Supreme Court may answer questions of law certified to it by federal courts, the question of whether to certify rests "in the sound discretion of the federal court." *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1120 (10th Cir. 2008) (citation omitted). And the federal court must apply "judgment and restraint before certifying." *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007). "Absent some recognized public policy or defined principle guiding the exercise of the jurisdiction conferred, federal courts bear a duty to decide questions of state law when necessary to render a judgment." *Colony Ins. Co. v. Burke,* 698 F.3d 1222, 1235 (10th Cir. 2012) (quotations and citations omitted).

Further, the Tenth Circuit advises federal courts not to "trouble our sister state courts every time an arguably unsettled question of state law comes across our desks." *Pino*, 507 F.3d at 1236. Rather, when a federal court perceives "a reasonably clear and principled course," it should seek to follow it. *Id.* "Certification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law." *Stout*, 519 F.3d at 1120 (citation omitted).

## II.  <u>Analysis:</u>

Before the Court is Ms. Graham's Motion for Certification (**Doc. 62**), and BCBSNM's Cross-Motion for Judgment on the Pleadings (**Doc. 64**). The Court begins with BCBSNM's

Cross-Motion for Judgment on the Pleadings, as a reasonable resolution of the issues raised therein would render certification of Ms. Graham's proposed questions unnecessary.

### A. BCBSNM's Cross Motion for Judgment on the Pleadings:

In this Motion, BCBSNM argues that it is entitled to judgment on the pleadings on all of Ms. Graham's remaining claims, specifically her claims under the TFPA (Count IV and V) and under the UPA (Count VI).  (**Doc. 64**).

####    *1. Ms. Graham's TFPA Claims (Counts IV and V):*

BCBSNM moves to dismiss Ms. Graham's TFPA claims, arguing that the legislature did not intend for the TFPA to apply to Medicaid MCOs.  *Id.* **at 11**.   In support, BCBSNM asserts that the TFPA's plain language does not expressly include Medicaid MCOs or the Medicaid Program, whereas other provisions of the insurance code do.  BCBSNM also contends that the Medicaid Contract does not qualify as a "policy" and that Ms. Graham does not qualify as an insured under the TFPA.  *Id.* **at 11–16**.

Ms. Graham argues that the TFPA explicitly applies to Medicaid MCOs because a Medicaid MCO qualifies as a Health Maintenance Organization ("HMO"), which the TFPA expressly includes in its definition of an insurer.  (**Doc. 67**) **at 5–6**.  She further asserts that because BCBSNM is an insurer and provides her coverage under a health plan, she qualifies as an insured.  *Id.* **at 8**.  Additionally, she emphasizes that the TFPA extends protections to claimants, contending that by obtaining coverage under the Defendant's health plan, she is both an insured and a claimant.  *Id.* **at 10**.

While the Court is not persuaded that an MCO qualifies as an HMO under the TFPA, it finds the plain language of the TFPA does apply to MCOs as they are engaged in business subject to the superintendent's supervision.

11

The question of whether a Medicaid MCO falls within the scope of the TFPA is one of statutory interpretation.  When construing a statute, the New Mexico Supreme Court's primary goal is to further legislative intent.  *State v. Vest*, 2021-NMSC-020, ¶ 14.  The starting point for this inquiry is the plain language of the statute, as it is the primary indicator of legislative intent.  *Id.* However, courts do not read the statutory language in isolation; courts must consider the broader act in which it is situated.  *Chatterjee v. King*, 2012-NMSC-019, ¶ 12; *see also State v. Rivera*, 2004-NMSC-001, ¶ 13 (explaining that in construing a statute, New Mexico courts closely examine the overall structure of the statute).

With respect to the TFPA's scope, § 59A-16-1 reads as follows:

> The provisions of Chapter 59A, Article 16 NMSA 1978 as applicable shall apply as to insurers, fraternal benefit societies, nonprofit health care plans, health maintenance organizations, prepaid dental services organizations, motor clubs, agents, brokers, solicitors, adjusters, providers of services contracts. . . and all other persons engaged in any business which is now or hereafter subject to the superintendent's supervision under the Insurance Code. . . . For the purposes of that article, the societies, organizations, clubs and persons shall be included within the meaning of "insurer," and contracts issued by them are included within the meaning of "policy."

The plain language of the TFPA is clear and unambiguous.  The first sentence lists out the person and entities to which the TFPA applies.  The second sentence clarifies how fraternal benefit societies, nonprofit health care plans, health maintenance organizations, motor clubs, etc. are included under the term insurer for purposes of the TFPA.  Medicaid MCOs must therefore qualify as one of the enumerated entities or persons for the TFPA to apply to BCBSNM.

As a preliminary matter, the Court notes that, for purposes of the TFPA, a Medicaid MCO is not an HMO.  Although HMOs and MCOs share similarities in providing and coordinating medical services on a prepaid basis, the New Mexico Insurance Code, when read as a whole, treats these entities as distinct.  For example, in the Prior Authorization Act, the legislature defined health insurer as "a health maintenance organization, nonprofit health care plan, provider

12

service network, medicaid managed care organization, or third-party payer or its agent." NMSA 1978, § 59A-22B-2. If a Medicaid MCO qualified as an HMO, such language would be surplusage or superfluous. *See State v. Javier M.*, 2001-NMSC-030, ¶ 32, 131 N.M. 1, 33 P.3d 1 ("A statute must be construed so that no part of the statute is rendered surplusage or superfluous."). Consequently, a Medicaid MCO is not an HMO for purposes of the TFPA.

Next, the Court considers whether an MCO falls under the TFPA's catch-all provision—"all other persons engaged in any business which is now or hereafter subject to the superintendent's supervision under the Insurance Code." § 59A-16-1. This language applies to Medicaid MCOs.

Under the Medicaid Contract, Medicaid MCOs must obtain the necessary licenses to "engage in risk-based contracting through a managed care network of providers, as required by the New Mexico Insurance Code, NMSA 1978, Chapter 59A *et seq*." Medicaid Contract at § 3.1.1. Also, as demonstrated in this case, Medicaid MCOs submit to service of process via the superintendent of insurance. (**Doc. 27**) **at 5**. Further, under the Patient Protection Act, Medicaid enrollees may appeal adverse decisions by MCOs to the superintendent of insurance, provided they have not already appealed the same issue to HSD under the Public Assistance Appeals Act. NMSA 1978, § 59A-57-10. These facts establish that MCOs are engaged in business subject to the superintendent's supervision under the Insurance Code. This is true even though the Managed Health Care Bureau, under the Office of the Superintendent of Insurance, acknowledged its lack of regulatory authority over the Medicaid program**.** Regulatory authority and supervision are distinct concepts. Here, the superintendent's role in licensing, service of process, and appeal adjudication demonstrates meaningful supervision over Medicaid MCOs such as BCBSNM, even in the absence of regulatory authority. Consequently, Medicaid MCOs

are subject to the superintendent's supervision under the Insurance code, meaning the TFPA applies to BCBSNM.

Because BCBSNM qualifies as a person engaged in business subject to the superintendent's supervision under the Insurance Code, it qualifies as an "insurer" and the Medicaid Contract a "policy" under the TFPA. *See* § 59A-16-1 ("For the purposes of that article, the societies, organizations, clubs and persons shall be included within the meaning of 'insurer', and contracts issued by them are included within the meaning of 'policy.'").

While a Medicaid MCO is an insurer and the Medicaid Contract a policy under the TFPA, the Court's analysis of whether Ms. Graham may assert a claim against BCBSNM under the TFPA does not end. Ms. Graham must also be the type of person that can assert a private action against BCBSNM under the TFPA, specifically § 59A-16-30, which states as follows: "[a]ny person covered by Chapter 59A, Article 16 NMSA 1978 who has suffered damages as a result of a violation of that article by an insurer or agent is granted a right to bring an action in district court to recover actual damages."

The New Mexico Supreme Court addressed § 59A-16-30 and its scope in *Jolley v. Associated Elec. & Gas Ins. Servs. Ltd.*, 2010-NMSC-029, ¶ 22. In *Jolley*, the New Mexico Supreme Court explained that it found nothing indicating that the "Legislature intended to extend a private action to claimants who are neither parties to the insurance contract nor special beneficiaries of a statutory scheme requiring mandatory insurance for the benefit of third parties." *Id.*

The New Mexico Supreme Court's decision in *Jolley* followed its decisions in *Russell v. Protective Ins. Co.*, 1988-NMSC-025, *abrogated on other grounds by Cruz v. Liberty Mut. Ins. Co.*, 1995-NMSC-006, and *Hovet v. Allstate Ins. Co.*, 2004-NMSC-010.

14

In *Russell,* the New Mexico Supreme Court held that an employee qualified as an insured under a workers' compensation contract between the employer and the insurer—even though the employee was not a first party insured under the contract. 1988-NMSC-025, ¶ 18. The Supreme Court emphasized that the language in the TFPA, which equates "insured" with "claimants," indicated "the legislature did not intend to limit Article Sixteen simply to the traditional notion of 'insured'; that is, it intended to expand the notion of parties other than those who may have signed a written contract of insurance beneath a blank reading 'insured.'" *Id.* at ¶ 14. The Supreme Court clarified that in saying this, it was "referring to parties traditionally referred to in contract law as third-party beneficiaries, and in tort law as incidental tort victims." *Id.* at ¶ 15.

In *Hovet*, like in *Russell*, the New Mexico Supreme Court construed the TPFA to determine whether a third-party claimant was able to bring a private action under the TPFA. 2004-NMSC-010, ¶ 9. *Hovet* arose in the context of vehicular accidents and addressed whether the victim of a negligent tortfeasor can sue the tortfeasor's insurer if it engages in bad faith while settling the victim's personal injury claims. *Id.* at ¶ 2. The Supreme Court recognized that the victim of a negligent tortfeasor was an intended beneficiary because the "compulsory automobile liability insurance laws can . . . be read as legislative recognition of the victim as an intended beneficiary of the insurance policy." *Id.* at ¶ 20 (internal quotation marks and citation omitted). As these victims were intended beneficiaries, the Supreme Court concluded that they could assert a private action against an insurer pursuant to the TFPA. *Id.* at ¶ 21.

Here, considering the New Mexico Supreme Court's decisions in *Jolley*, *Hovet*, and *Russell*, this Court finds that Ms. Graham, as a medicaid enrollee, likely cannot assert a private action against BCBSNM under the TFPA. Ms. Graham is not a party to the Medicaid Contract as it is between the HSD and BCBSNM. Ms. Graham is also not an intended third-party beneficiary, as explained in this Court's Memorandum Opinion and Order on Ms. Graham's

15

Motion to Remand. (**Doc. 24**) **at 8–10**. However, the Court has yet to determine whether Ms. Graham qualifies as an incidental beneficiary of the Medicaid Contract, a status that could affect her ability to assert a private action against BCBSNM under the TFPA.

Because the parties have not addressed the Supreme Court's decisions in *Jolley*, *Hovet*, and *Russell* in their briefing, the Court reserves ruling on this issue. The Court **ORDERS** the parties to submit additional briefing within 30 days of entry of this Memorandum Opinion and Order, addressing whether the New Mexico Supreme Court's decisions in *Jolley*, *Hovet*, and *Russell* preclude Ms. Graham from asserting a private action against BCBSNM under the TFPA.

In sum, while MCOs like BCBSNM fall under the scope of the TFPA, it is unclear whether Ms. Graham, as a Medicaid enrollee, can assert a private action against BCBSNM under the TFPA. The Court will reserve ruling on whether dismissal is appropriate on Ms. Graham's TFPA claims pending additional briefing by the parties.

   *2. Ms. Graham's UPA Claims:*

In its Cross-Motion, BCBSNM argues that dismissal of Ms. Graham's UPA claim is appropriate because (1) the state of New Mexico is the only purchaser, (2) the plain language of the Medicaid contract forecloses these claims, and (3) that the behavior Mr. Graham complains of was not in connection with the sale, lease, rental, or loan of goods and services. (**Doc. 64**) **at 18–20**.

Ms. Graham responds that BCBSNM's "seeming insistence that the prohibited conduct need be directed as the purchaser to run afoul the statute is consistent neither with statutory language nor with *Lohman*." (**Doc. 67**) **at 12**. Further, Ms. Graham argues that she is not attempting to enforce the contract, she is making claims against Defendant for misrepresentation and for refusing to provide her health benefits, all while trying to evade state review. ***Id.*** **at 13**.

After reviewing New Mexico precedent on the scope of the UPA, the Court agrees with BCBSNM: Ms. Graham's UPA claim fails because the challenged conduct was not in connection with the sale of goods or services, as required under §§ 57-12-2(D), (E). The flaw in Ms. Graham's UPA claim is that she neither purchased nor attempted to purchase any good or service from BCBSNM or any other party.

Ms. Graham relies on the New Mexico Court of Appeals decisions in *Lohman* and *Maese v. Garrett*, 2014-NMCA-072, in support of her claim that BCBSNM engaged in unfair trade practices and unconscionable conduct *in connection with* the sale, rental, lease, or loan of goods or services.

In *Lohman*, the New Mexico Court of Appeals addressed whether automobile owners could assert a UPA claim against a seatbelt manufacturer for its representations to a distributor that facilitated car sales to consumers. 2007-NMCA-100, ¶ 21. Notwithstanding the indirect relationship between the manufacturer and consumers, the Court of Appeals noted that "[t]he provisions [of the UPA] appear to be crafted so as to ensure that the UPA has a broad scope— arguably, broad enough to encompass misrepresentations which bear on downstream sales by and between third parties." *Id.* ¶ 30. Thus, the court concluded that "both the plain language of the [UPA] and the underlying policies suggest that a commercial transaction between a claimant and a defendant need not be alleged in order to sustain a UPA claim." *Id.* ¶ 33.

In *Maese*, a plaintiff brought a UPA claim against his financial advisors for wrongly telling him he could withdraw money tax-free from an annuity that the defendants recommended he purchase. *Id.* ¶¶ 3–7. The defendants argued that the plaintiff's claim did not fall under the UPA because he did not pay them for the incorrect financial advice or for the withdrawal from the annuity. *Id.* ¶ 16. Nonetheless, citing the its liberal construction of the UPA in *Lohman*, the *Maese* Court of Appeals found it "immaterial that [the p]laintiff did not specifically compensate

17

[the d]efendants for financial advising services where [the d]efendants received compensation from third parties (e.g., from [the annuity company] for the annuity in question) for investment advice that led to [the p]laintiff's purchase of their products." *Id.* ¶ 19

The Court disagrees with Ms. Graham that *Lohman* and *Maese* dictate that Ms. Graham's UPA claims are viable. While the Court of Appeals' decisions in *Lohman* and *Maese* affirm that the UPA's scope is broad and does not require a direct transaction between the plaintiff and defendant, both cases involved plaintiffs who purchased goods or services. In *Lohman*, the automobile owners purchased vehicles that included the allegedly defective seatbelt. In *Maese*, the plaintiff purchased an annuity influenced by the defendants' misrepresentations. Thus, even under *Maes* and *Lohman* a plaintiff must establish that she purchased something or at least sought to purchase something to establish a viable UPA claim.

This conclusion is further supported by the cases relied on by BCBSNM, *Hicks v. Eller*, 2012-NMCA-061, and *Vigil v. Taintor*, 2020-NMCA-037.

In *Hicks*, a plaintiff brought a UPA claim against an art appraiser who purchased two paintings from the plaintiff after the plaintiff declined to retain the appraiser's services to value the art. *Hicks*, 2012-NMCA-061, ¶¶ 4–9, 20. Relying on *Lohman* and emphasizing the UPA's purpose as a consumer protection statute, the New Mexico Court of Appeals explained that the UPA requires that "somewhere along the purchasing chain, the claimant did *purchase* an item that was at some point sold by the defendant." *Id.* ¶¶ 19–20 (emphasis added). The court then concluded that the plaintiff, who did not purchase the defendant's services and acted as the seller of the art, had no standing to bring a UPA claim against the appraiser. *Id.* ¶ 20. The court further noted "[c]onsistent with its purpose as consumer protection legislation, the UPA gives standing only to buyers of goods or services." *Id.*

In *Vigil*, a corporation owned by the defendant began manufacturing and selling several products bearing the plaintiff's image. 2020-NMCA-037, ¶ 2. The defendant did not have the plaintiff's permission to use her image, and this went unnoticed by the plaintiff until her daughter purchased a flask bearing the plaintiff's image and gifted it to the plaintiff. *Id.* Eventually the plaintiff sued the defendant alleging unauthorized use of her image under the UPA. *Id.* The district court found that the plaintiff did not have standing to bring her UPA claim, "as she did not purchase anything." *Id.* ¶ 20.

On appeal, the New Mexico Court of Appeals affirmed the district court's grant of summary judgment and rejected the plaintiff's reliance on *Lohman* because the defendants in the case before it were arguing that the "[p]laintiff must have purchased the flask *from someone*, an argument that *Lohman* did not address." *Id.* at ¶ 23. The Court of Appeals further specified that "*Lohman* does not stand for the proposition that the UPA's scope is so broad as to encompass claimants who did not actually purchase anything." *Id.* The Court then found no basis in the UPA or in the case law interpreting the UPA to support the plaintiff's theory that "her claim— which [was] not connected to any goods or services she purchased— [fell] within the purview of the UPA." *Id.* at ¶ 26.

All the cases cited by the parties share a common requirement: the plaintiff must have purchased or attempted to purchase a good or service, and the defendant's unfair trade practices or unconscionable conduct must be connected to that transaction in some way (e.g., causing, influencing, preventing, or occurring during the transaction). The medical services and coverage BCBSNM provides to Medicaid enrollees are akin to the flask in *Vigil*, which was purchased for the plaintiff by her daughter. Here, Ms. Graham neither purchased nor sought to purchase any good or service. Instead, she sought a benefit that the state had already purchased on her behalf. In the Medicaid program, it is the state—not the enrollee—that purchases coverage and medical

19

services, administering them through Medicaid MCOs. Therefore, regardless of whether BCBSNM's conduct was unfair or unconscionable, it lacks the necessary connection to an actual or potential purchase by Ms. Graham. Because BCBSNM's actions were not connected to the sale, rental, lease, or loan of goods or services by Ms. Graham, her UPA claim fails.

**B. Ms. Graham's Motion for Certification:**

Ms. Graham sought certification to the New Mexico Supreme Court on the following questions:

> Is a for-profit health insurance company that provides Medicaid benefits pursuant to a contract with the State of New Mexico subject to the common law of insurance, the Insurance Code, NMSA § 59A-16-1 *et seq.*, and the Unfair Practices Act, NMSA § 57-12-1 et seq. when it 1) refuses to provide benefits that are due under law, 2) forces the beneficiary to file multiple appeals in order to receive those benefits, and 3) communicates false information to the Medicaid recipient to whom it is obligated to provide benefits?

**Doc. 62 at 1**. After considering BCBSNM's cross-motion for judgment on the pleadings, the Court concludes that there is a clear and principled course of answering Ms. Graham's proposed questions. As a result, the Court finds no need to certify these questions to the New Mexico Supreme Court and will deny Ms. Graham's Motion to Certify (**Doc. 62**).

## <u>CONCLUSION</u>

Consistent with its analysis above, the Court reserves ruling on BCBSNM's Motion for Judgment on the Pleadings regarding Ms. Graham's TFPA claims (Counts IV and V) pending further briefing on whether Ms. Graham, as a Medicaid enrollee and a non-party to the Medicaid contract, can assert a private action against BCBSNM under the TFPA in light of the New Mexico Supreme Court's decisions in *Jolley*, *Hovet*, and *Russell*.[4] Further, the Court finds

---

[4] The Court directs the parties to limit their additional briefing to a discussion of the New Mexico Supreme Court's decision in *Jolley*, *Hovet*, and *Russell*, focusing solely on whether Ms. Graham, as a Medicaid enrollee, has standing sue BCBSNM under the TFPA, specifically § 59A-16-30. The parties may not revisit issues already resolved in the Court's Order on

dismissal with prejudice is appropriate for Ms. Graham's UPA claim (Count VI) and that

certification to the New Mexico Supreme Court is unnecessary. Therefore, the Court **GRANTS**

**in part** BCBSNM's Cross-Motion for Judgment on the Pleadings (**Doc. 64**) and **DENIES** Ms.

Graham's Motion for Certification (**Doc. 62**).

Plaintiff shall file further briefing no later than thirty (30) days from the date of this

order. A responsive brief is due no later than fourteen (14) days thereafter.

**IT IS SO ORDERED.**

/s/ KENNETH J. GONZALES[5]
CHIEF UNITED STATES DISTRICT JUDGE

---

BCBSNM's Motion to Dismiss or this Memorandum Opinion and Order, nor introduce new arguments.

[5] Please note that this document has been electronically filed. To verify its authenticity, please refer to the Digital File Stamp on the NEF (Notice of Electronic Filing) accompanying this document. Electronically filed documents can be found on the court's PACER public access system.