## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JULIE GRAHAM, Individually
and on behalf of
all others similarly situated,

      Plaintiff,

v.                             No. 1:22-cv-00305-KG-GJF

BLUE CROSS AND BLUE SHIELD
of NEW MEXICO,

      Defendant.

### FIRST AMENDED COMPLAINT

PLAINTIFF, JULIE GRAHAM, pursuant to an Order of the Court on December 19, 2025 [Doc. No. 79] hereby timely files her First Amended Complaint on Count III of the original Complaint, Breach of Fiduciary Duty, and states as follows:[1]

### Summary of claims

Plaintiff GRAHAM, as a result of serious medical conditions, is Medicaid eligible and receives Medicaid assistance from the State of New Mexico. The State of New Mexico calls its Medicaid program "Centennial Care," and has elected to provide certain Medicaid benefits through a managed care system.

The State of New Mexico has contracted with a Managed Care Organization, Defendant Blue Cross and Blue Shield of New Mexico ("BCBS"), to provide certain Medicaid benefits to eligible New Mexico citizens. Defendant BCBS calls its New Mexico Medicaid managed care program "Blue Cross Community Centennial."

---

[1] Plaintiff GRAHAM, while not reciting class allegations in this First Amended Complaint as limited by the Court, does not withdraw, and fully maintains, her class allegations.

In order to obtain Medicaid benefits to which she was legally entitled, Plaintiff GRAHAM was obligated to enroll in a Managed Care Organization.  Plaintiff GRAHAM duly enrolled in Defendant BCBS's Blue Cross Community Centennial program.

Plaintiff GRAHAM alleges that Defendant BCBS, although obligated by law and by contract to authorize certain medical care for Plaintiff GRAHAM, routinely and systematically and as part of its business practices refused such authorization in order to discourage Plaintiff GRAHAM from obtaining this care, forcing her to repeatedly appeal Defendant's denial of benefits, first to Defendant and then to the State of Mexico's Fair Hearing Bureau.  After all those appeals were made and prior to the start of the Fair Hearing, Defendant BCBS then at the last minute agreed to provide the benefits Plaintiff GRAHAM sought and was due under New Mexico's Medicaid program and under the Contract.  Plaintiff GRAHAM alleges Defendant BCBS engages in the business practices of forcing Medicaid recipients to file multiple appeals in order to discourage claimants from seeking care and to increase its profits.  Plaintiff GRAHAM also alleges that Defendant BCBS engages in these business practices of avoiding Fair Hearing Bureau review, at least in some instances, to avoid oversight by the State of New Mexico of its business practices.

Plaintiff GRAHAM seeks class action status, to act on behalf of herself and all other New Mexico citizens similarly situated.

## The parties, jurisdiction, and venue

### I. The parties.

1. Plaintiff JULIE GRAHAM ("GRAHAM") is a citizen of New Mexico and a resident

of the County of Bernalillo, State of New Mexico.

2. Defendant BCBS is part of HEALTH CARE SERVICE CORPORATION, a foreign Mutual Legal Reserve Company with its mailing address at 300 East Randolph, Chicago, Illinois 60601. On information and belief, Defendant BCBS is authorized to provide insurance and transact business in the State of New Mexico. Defendant BCBS's principal place of business is at 5701 Balloon Fiesta Parkway NE, Albuquerque, New Mexico 87113. By operation of law, Defendant BCBS may be found and served with process in the County of Santa Fe, State of New Mexico by service upon the New Mexico Superintendent of Insurance.

## II. Jurisdictional facts.

3. Some time prior to January 1, 2019, Defendant BCBS entered into a Contract with the State of New Mexico and its agencies ("Contract").

4. Some purposes of the Contract are, in part, to provide services that will or are likely to improve quality of care or improve access to care to Medicaid-eligible Recipients.

5. The "Go Live" date of the Contract, the date on which Defendant assumed responsibility for providing the services enumerated in the Contract, was January 1, 2019. From time to time, the Contract has been renewed and/or amended by the parties, with the present version of the Contract being version number PSC 18-630-8000-0033 A4 CFDA 93.778. On information and belief, the present Contract runs until December 31, 2023, but may be renewed thereafter for additional one year periods not to exceed 8 years for the total contract period.

6. All of Defendant's responsibilities under the Contract must be performed, where

specified, in the State of New Mexico. The Contract, however, specifically allows benefits
to be provided from an out-of-state provider in the United States when certain conditions
are met, including where benefits sought are not available in the State of New Mexico.

7.    Under the terms of the Contract, Defendant BCBS must designate key
management and technical personnel responsible for performance of the Contract, which
the Contract calls "Key Personnel."   Key Personnel are those with management
responsibility or principal technical responsibility for certain functional areas, as opposed
to multiple persons equaling a full-time equivalent.

8.   Under the terms of the Contract, all Key Personnel shall reside in the State of
New Mexico.

9.   Defendant's President, Janice Torrez, a Key Personnel, is a resident of the State
of New Mexico.

10.    On information and belief, Defendant's Chief Executive Officer, a Key
Personnel, resides in the State of New Mexico.

11.  Defendant's Chief Medical Officer, a Key Personnel, resides in the State of New
Mexico.

12.    Defendant's board-certified psychiatrist who oversees all Behavior Health
activities and takes an active role in Defendant's medical management team and clinical
and policy decisions, a Key Personnel, resides in the State of New Mexico.

13.  Defendant's senior executive who oversees and is responsible for all long-term
care activities, a Key Personnel, resides in the State of New Mexico.

14.  Defendant's full-time Chief Financial Officer dedicated to the Contract, a Key
Personnel, resides in the State of New Mexico.

-4-

15.   Defendant's full-time Contract Manager dedicated to the Contract, a Key Personnel, resides in the State of New Mexico.

16. Defendant's full-time Compliance Officer, a Key Personnel, resides in the State of New Mexico.

17. Defendant's full-time Chief Information Officer, a Key Personnel, resides in the State of New Mexico.

18. Defendant's full-time staff person dedicated to the Contract who oversees and is responsible for provider services and provider relations, a Key Personnel, resides in the State of New Mexico.

19. Defendant's full-time staff person dedicated to the Contract who oversees and is responsible for all Utilization Management activities, QM/QI activities, and program integrity, a Key Personnel, resides in the State of New Mexico.

20. Defendant's full-time staff person dedicated to the Contract who oversees and is responsible for Native American Health disparity issues and Cultural Competence concerns, a Key Personnel, resides in the State of New Mexico.

21.   Defendant's six full-time staff persons who work with Indian Health Service, Tribal Health providers, or Urban Indian providers, Key Personnel, reside in the State of New Mexico.

22. Defendant's full-staff person dedicated to the Contract who oversees Member services, a Key Personnel, resides in the State of New Mexico.

23. Defendant's full-staff person dedicated to the Contract and who acts as Claims Administrator, a Key Personnel, resides in the State of New Mexico.

24. Defendant's full-time staff person dedicated to the Contract and who acts as

-5-

Grievances and Appeals manager, a Key Personnel, resides in the State of New Mexico.

25. Defendant's full-time staff person dedicated to the Contract and who acts as an Ombudsman, a Key Personnel, resides in the State of New Mexico.

26. Defendant's Director of Pharmacy, dedicated to the Contract and licensed to practice pharmacy in the State of New Mexico, resides in the State of New Mexico.

27. Defendant maintains a call center to answer its insureds' questions, concerns, inquiries, and complaints, with the center and its staff located and operated in the State of New Mexico.

28. Defendant is a citizen of the State of New Mexico, with its principal place of business located within the State of New Mexico. Defendant's officers direct, control, and coordinate Defendant's activities under the Contract in the State of New Mexico.

## III. Jurisdiction and venue.

29. This Court has jurisdiction over the subject matter and the parties in this action.

30. Venue is proper in this Court pursuant to New Mexico law.

### Facts common to all counts

## I. The State of New Mexico Centennial Care Medicaid Program and Defendant BCBS's contract with the State of New Mexico.

## A. Defendant BCBS's Contract with the State of New Mexico.

31. "Centennial Care" is the name of the New Mexico Medicaid program. Centennial Care began on January 1, 2014 with services provided by four managed care organizations (MCOs). These services include physical health, behavioral health, long-term care and community benefits.

32. Defendant BCBS is one of those managed care organizations. Defendant

BCBS participates in Centennial Care under contract with the State's Human Services Department to assist the State in meeting the requirements established under NMSA 1978, § 27-2-12, part of the State's Public Assistance Act.

33.  Some time prior to January 1, 2019, Defendant BCBS entered into a Contract with the State of New Mexico and its agencies ("Contract").  The "Go Live" date of the Contract, the date on which Defendant assumed responsibility for providing the services enumerated in the Contract, was January 1, 2019.  From time to time, the Contract has been renewed and/or amended by the parties, with the present version of the Contract being version number PSC 18-630-8000-0033 A4 CFDA 93.778.

34.  The purpose of the Contract is to provide Medicaid benefits, pursuant to federal and state Medicaid law, rules, and regulations, to which Plaintiff GRAHAM and others are entitled, on behalf of the State of New Mexico.  In the Contract, the State of New Mexico manifests an intention that Medicaid recipients, such as Plaintiff GRAHAM, receive the full and complete benefits afforded to them under federal and state Medicaid law, rules, and regulations.

35.  On information and belief, the Contract embodies federal and state law, rules, and regulations of the Medicaid program.  Under the terms of the Contract, Defendant BCBS is obligated to comply with all applicable federal and State statutes, rules, regulations, policies, consent decrees, executive order, and court orders.

36.  Pursuant to law, in order to obtain the Medicaid benefits to which she is entitled under federal and state law, rules, and regulations, Plaintiff GRAHAM was required to enroll with a managed care organization, such as Defendant BCBS, and Plaintiff GRAHAM did so enroll with Defendant BCBS.  She is a "Member" of Defendant BCBS's Blue Cross

Community Centennial program, and was a member at all times relevant to the allegations of this Complaint.

37. Eligibility for all Medicaid programs requires that individuals meet certain federal guidelines. These include citizenship, residency and income requirements. Plaintiff GRAHAM meets all those requirements.

38. Under the Contract, Defendant BCBS has an obligation to provide medical care to Members, such as Plaintiff GRAHAM, that is medically necessary. "Medically Necessary means physical, behavioral health, and long-term services and supports, and supplies, that: (i) are essential to prevent, diagnose or treat medical conditions or are essential to enable the Member to attain, maintain or regain the Member's optimal functional capacity; (ii) are delivered in the amount, duration, scope and setting that are both sufficient and effective to reasonably achieve their purposes and clinically appropriate to the specific physical, behavioral health, and long-term care needs of the Member; (iii) are provided within professionally accepted standards of practice and national guidelines; (iv) are required to meet the physical, behavioral health, and long-term care needs of the Member and are not primarily for the convenience of the Member, the provider, or the CONTRACTOR; and (v) are reasonably expected to achieve appropriate growth and development as directed by [the New Mexico] H[uman] S[ervices] D[epartment]."

39. Under the terms of the Contract, if Defendant BCBS is unable to provide care to a Member using one of the medical providers within its network, Defendant BCBS has an obligation to provide this care using a non-network provider.

40. Providers are institutions, facilities, agencies, physicians, health care practitioners, or other entities or persons that are licensed or otherwise authorized to

provide services to Members.

41.  Under the Contract, Defendant BCBS's duty to provide coordination of care for Members is non-delegable.

42.  Under the Contract, Defendant BC/BS's ultimate responsibility for quality management and quality improvement is non-delegable.

43.  Under the terms of the Contract, Defendant BCBS can not arbitrarily deny, or reduce in amount or scope, medical care to an otherwise eligible individual, such as Plaintiff GRAHAM, simply because Plaintiff GRAHAM had a poor prognosis, or because of Plaintiff GRAHAM's diagnosis, type of illness, or condition.

44.  Defendant BCBS acts as and is an insurance company, providing health insurance to Medicaid recipients under the terms of the Contract.  Health insurance, as defined in the Contract, "means insurance that covers the whole or part of the risk of a person['s] incurring medical expenses, spreading the risk over a large number of persons." Plaintiff GRAHAM is one of Defendant BCBS's insureds.

45.  Defendant BCBS represents or represented to the State of New Mexico, and the public at large, that its business purpose is:

> [t]o transact all types of health insurance as defined in NMSA 59A-7-3 and to establish and operate a health maintenance organization pursuant to NMSA 59A-46-3.  To render services related to the Corporation's insurance business, including, but not limited to, actuarial, loss prevention, data processing, risk management, accounting, claims, appraisal and collection services.

46.  Under the Contract, Defendant BCBS has an obligation to ensure that any decision to deny a service authorization request or to authorize a service in an amount, duration, or scope that is less than requested, be made by a health care professional who

has appropriate clinical expertise in treating the Member's condition or disease.

47. The Contract contains a boiler plate "No Third-Party Beneficiary" clause. The Contract's boiler plate "No Third-Party Beneficiary" clause, as a matter of public policy and law, does not bar Centennial Care Members, such as Plaintiff GRAHAM, from bringing claims against Defendant BCBS to enforce their rights under the Contract and federal and state Medicaid law, rules, and regulations for benefits to which they are entitled. Notwithstanding any disclaimer in the Contract, the language of the entire contract, taken as a whole, shows that Plaintiff GRAHAM is an intended third-party beneficiary to the Contract, entitled to enforce the Contract, either individually or as a member of a class of beneficiaries.

**B.    Appeals of denial of Medicaid benefits or medical care.**

48. Defendant BCBS, in the first instance, solely decides whether to provide Medicaid benefits or Medicaid-eligible medical care to Community Centennial enrollees such as Plaintiff GRAHAM.

49. If Defendant BCBS denies Medicaid benefits or medical care, Defendant BCBS has, pursuant to the terms of the Contract, an internal appeal process. Insureds such as Plaintiff GRAHAM who are aggrieved by any initial adverse benefit determination are required to first participate in that internal process before requesting an external appeal, to the State of New Mexico Fair Hearings Bureau.

50. In order to obtain medical care to which she was entitled by federal and state Medicaid law and regulation, therefore, Plaintiff GRAHAM had to exhaust Defendant BCBS's internal appeal before asking the State of New Mexico, through the Fair Hearings Bureau, for help.

51.   Under the Contract and the Centennial Care program, in the event that Defendant BCBS denies Plaintiff GRAHAM's internal appeal, Plaintiff GRAHAM can then appeal this second benefit denial directly to the State's Fair Hearings Bureau.

52.   Under the terms of the Contract, "Fair Hearing means the administrative decision-making process that requires aggrieved individuals to be given the opportunity to confront the evidence against them and have their evidence considered by an impartial fact finder in a meaningful time and manner."

53.  In addition to these appeals processes, Defendant BCBS is required, under the Contract, to employ

> A full-time staff person dedicated to th[e Contract] who shall, with a significant degree of independence from the CONTRACTOR's management, act as an Ombudsman whose duties include but are not limited to impartially investigating and addressing Member issues and attempting to resolve them within the CONTRACTOR's organization; and identifying systemic issues including, but not limited to, the Members' ability to access services, to receive prompt attention from care coordinators and other personnel and to understand their rights and responsibilities under Centennial Care. The Ombudsman shall represent the Member on internal Centennial Care issues and is separate and distinct from the CONTRACTOR's Grievance system and Appeals process, as prescribed in Section 4.16 of th[e Contract]. Upon hiring the Ombudsman, the CONTRACTOR shall include in its notification to HSD where in the CONTRACTOR's organizational structure the Ombudsman is located in order to assure significant independence from plan management.

## C.   Defendant BCBS's income from the Contract.

54.  The State of New Mexico pays Defendant BCBS a payment, called a Capitation Payment, for each Member, such as Plaintiff GRAHAM, enrolled in the Centennial Care program who is insured by Defendant BCBS.  This Capitation Payment is a payment the State of New Mexico makes periodically to Defendant BCBS on behalf of each Member beneficiary enrolled under the Contract.  Under the terms of the Contract, the "State makes

the payment regardless of whether the particular member beneficiary receives services during the period covered by the payment."

55. This Capitation Payment is essentially an insurance premium that the State of New Mexico pays on behalf of, and for the benefit of, Members, including Plaintiff GRAHAM. If the services Defendant BCBS provides to Members cost less than the Capitation Payment the State of New Mexico makes for each Member, Defendant BCBS keeps the difference, subject to certain limitations.

56. Under the terms of the Contract, Defendant BCBS is allowed to have an "underwriting gain." The Contract defines an "underwriting gain" as Defendant BCBS's "net income before State and federal taxes for [Defendant BCBS's] Medicaid line of business on an annual basis."

57. If Defendant BCBS has an underwriting gain, under the terms of the contract Defendant BCBS keeps one-hundred percent (100%) of that gain up to three percent (3%) of net capitation revenue generated annually.

58. The Contract defines net capitation revenue as Defendant BCBS's prospective capitation premium, excluding Indian Health Service supplemental revenue, less Premium Tax, less New Mexico Medical Insurance Pool and Health Insurance Exchange Assessments during the annual period.

59. Further, the Contract allows Defendant BCBS to keep fifty percent (50%) of any underwriting gain generated in excess of that three percent (3.0%).

60. To further ensure that its operations are profitable and that it does not become subject to a catastrophic loss, Defendant BCBS, per the terms of the Contract, maintains an insurance policy insuring itself up to one million dollars ($ 1,000,000.00) per occurrence

-12-

or per Member per incurred year, for protection against financial loss due to outlier (catastrophic) cases.

## II. Plaintiff GRAHAM

### A.      Plaintiff GRAHAM's requests for medical care.

61.    Plaintiff GRAHAM was born on December 16, 1964.  Over time, Plaintiff GRAHAM suffered from various medical conditions, including acute and chronic pancreatitis.  In 2019 and 2020, Plaintiff's pancreatitis became more pronounced and severe, and became profoundly debilitating.

62.  In 2019 and progressing into 2020, Plaintiff GRAHAM was hospitalized multiple times for her pancreatitis condition.  A review of medical records shows, on information and belief, that those hospitalizations occurred on May 11, 2019, June 20, 2019, September 11, 2019, September 21, 2019, December 6, 2019, December 28, 2019, January 26, 2020, February 7, 2020, May 7, 2020, June 23, 2020, July 17, 2020, September 2, 2020, September 26, 2020, October 15, 2020, November 17, 2020, November 23, 2020, December 10, 2020,  and December 27, 2020.  Beginning in at least mid-2020, Plaintiff GRAHAM's condition was so severe that she was placed on total parenteral nutrition, and was continuously medicated for severe pain.  Over the course of 18 months, Plaintiff GRAHAM unintentionally lost some 25 pounds.

63.    Plaintiff GRAHAM's illness significantly impacted her livelihood. Plaintiff GRAHAM is a Registered Nurse, trained as a home health nurse.  Over several months, Plaintiff GRAHAM lost 3 different jobs because of an inability to maintain work hours because of her illness.  As a result of her illness and inability to work, Plaintiff GRAHAM

became Medicaid eligible and enrolled in Defendant BCBS's Blue Cross Community Centennial program.

64.   As a treatment for Plaintiff GRAHAM's acute and chronic pancreatitis, starting in June, 2020, Plaintiff GRAHAM's surgeons and gastrointestinal specialists at the University of New Mexico recommended a total pancreatectomy with islet cell autologous transplantation ("TP-IAT").   That beneficial procedure, however, was not available in New Mexico at the time, or for the rest of 2020.   Plaintiff GRAHAM's physicians specifically noted in her medical records that the TP-IAT procedure was not available in New Mexico.

65.   Although Defendant BCBS is required by the Contract to ensure that an Ombudsman is available to assist its insureds, such as Plaintiff GRAHAM, Defendant BCBS did not encourage or inform, through its care coordinator, Plaintiff GRAHAM of her ability and right to seek assistance from the Ombudsman.

66.   Rather, Defendant BCBS sent Plaintiff GRAHAM on a wild goose chase, suggesting she go to Texas to obtain care, without telling her that care was unavailable.

67.   When Plaintiff GRAHAM sought permission from Defendant BCBS to travel to Texas as suggested, Defendant BCBS told Plaintiff GRAHAM she would have to pay all expenses for this visit, including doctor's bills.

68.   Plaintiff GRAHAM dutifully did as Defendant BCBS suggested, spending significant funds, unreimbursed by Defendant BCBS, to seek care in Texas, which she then learned was unavailable.

69.   After doing further research on her own, Plaintiff GRAHAM sought a second opinion with respect to the TP-IAT procedure with Virginia Commonwealth University ("VCU") Health Systems medical personnel on August 28, 2020.   That second opinion

consultation confirmed that Plaintiff GRAHAM was a candidate for the TP-IAT procedure and that this procedure could be performed at VCU.

70. Following this second opinion, Plaintiff GRAHAM sought pre-authorization from Defendant BCBS to have this procedure done at VCU Health Systems in Richmond, Virginia. Under Medicaid federal and state laws, rules, and regulations, and the Contract, Plaintiff GRAHAM was entitled to this medical care that she requested, and entitled to have that care provided at VCU.

71. Defendant BCBS refused the requested pre-authorization for Plaintiff GRAHAM to obtain the TP-IAT procedure at VCU.

72. Defendant BCBS forced Plaintiff GRAHAM to file an internal appeal of the refused authorization. Defendant BCBS then denied the internal appeal.

73. By denying the internal appeal, Defendant BCBS forced Plaintiff GRAHAM to file an administrative appeal to the Fair Hearings Bureau.

74. Once the Fair Hearing was convened, but before the administrative law judge started taking evidence in the case, Defendant BCBS then agreed to provide the requested authorization. Defendant BCBS thus avoided scrutiny by the State's administrative law judge of its prior denials of care.

**B.    Defendant BCBS's unfounded and frivolous refusal to authorize medical care.**

75. On September 24, 2020, Defendant BCBS denied authorization to Plaintiff GRAHAM to have the TP-IAT procedure performed outside the State of New Mexico. Defendant BCBS told Plaintiff that her request did not "meet clinical criteria." Defendant BCBS stated the following reasons for its denial:

We reviewed the service your doctor asked for. We also reviewed your health plan rules of coverage. Your doctor asked for you to be seen by Dr. Marlon Levy, VCU Health System Richmond, VA 23298. You have a bad pancreas. You have trouble digesting your food. You have lost weight. Medications can only help you so much. You may need surgery. It needs to be done in a hospital. However this hospital is not part of your health plan. We cannot approve you to see providers that are not part of your health plan unless it is an emergency. Your doctors notes do not say that this is an emergency. We are denying the request. This is addressed in the Blue Cross Community Centennial Member Handbook, page 18; stating services from an out-of-network provider are not covered without first getting prior authorization from Blue Cross Blue Shield of New Mexico. It is also denied as out-of-network (OON) per the New Mexico Administrative Code (NMAC) 8.308.2.9 as those providers located beyond 100 miles of the New Mexico border.

76.    Contrary to Defendant BCBS's assertions, Defendant BCBS's Member Handbook, Page 18, does not state that the medical care pre-authorization sought by Plaintiff GRAHAM from an out-of-network provider can be obtained only in an emergency. Rather, the handbook states that such care can be obtained, *without pre-authorization*, on an emergency basis.  Plaintiff GRAHAM was following plan requirements to the letter, seeking the pre-authorization required by the plan for out-of-network care.

77.    Contrary to Defendant BCBS's assertions, Defendant BCBS's Member Handbook, Page 18, does not state or suggest that Plaintiff GRAHAM's medical care request should be denied.  Rather, Page 18 states that the care requested is not covered without first getting prior authorization from Defendant BCBS.  Prior authorization is precisely what Plaintiff GRAHAM was seeking.

78. Most egregiously, contrary to Defendant BCBS's assertions, NMAC § 8.308.2.9 does not forbid the providing of services beyond 100 miles of the New Mexico border. Rather, NMAC § 8.308.2.9 encourages services to be provided within 100 miles of New Mexico's borders but specifically *allows* medical services to be provided *beyond* 100 miles

-16-

of the New Mexico border, so long as they are in the United States:

> Utilization of out-of-state providers: To the extent possible, the MCO is *encouraged* to utilize in-state and border providers, which are defined as those providers located within 100 miles of the New Mexico border, Mexico excluded. The MCO *may* include out-of-state providers in its network. All services must be rendered within the boundaries of the United States.

N.M. Code R. § 8.308.2.9(D) (emphasis added).

79. In its initial denial, therefore, Defendant BCBS made several false and misleading statements to Plaintiff GRAHAM. The justifications Defendant BCBS gave Plaintiff GRAHAM for its denial of care were, due to their falsehood, inherently unreasonable.

80. Under the terms of the Contract, Defendant BCBS had an obligation to ensure that any decision to deny a service authorization request or to authorize a service in an amount, duration or scope that is less than requested, be made by a health care professional who has appropriate clinical expertise to understand the treatment of the Member's condition or disease.

81. On information and belief, Defendant BCBS's September 24, 2020 denial was made by its "Clinical Director" Dr. Aiden O'Rourke, M.D. On information and belief, Dr. O'Rourke is a general surgeon, is not a gastroenterologist, is not a specialist in the treatment of acute and chronic pancreatitis, and is not a transplant surgeon. Thus, Dr. O'Rourke did not have appropriate clinical expertise to understand the treatment of Plaintiff GRAHAM's condition, contrary to Defendant BCBS's contract obligations.

82. Inconsistent with Defendant BCBS's stated reasons for denial, in his review and denial of Plaintiff GRAHAM's pre-authorization request, Defendant BCBS's Dr. Aiden O'Rourke "recommended" possible providers in New Mexico to provide the requested care.

However, those "recommendations" were all for all general surgeons, none of whom were gastrointestinal or transplant specialists. Contradicting Defendant BCBS's own justification for denying medical care to Plaintiff GRAHAM, Defendant BCBS's Dr. O'Rourke also recommended the University of Colorado for "transplant services," even though the University of Colorado is outside a geographical area within 100 miles of the New Mexico border. Moreover, the TP-IAT procedure was not available at the University of Colorado at the time that Defendant BCBS told Plaintiff GRAHAM she could go there for the procedure. Defendant BCBS's Dr. O'Rourke made several false or misleading statements to Plaintiff GRAHAM.

83. Further, Defendant BCBS's Dr. O'Rourke made those "recommendations" for treatment in New Mexico all the while ignoring that Plaintiff GRAHAM's doctors had specifically noted in her medical records that the transplant procedure Plaintiff GRAHAM required was not available in New Mexico. Thus, Defendant BCBS's Dr. O'Rourke was not familiar with or had not reviewed Plaintiff GRAHAM's medical record before denying the medical care she requested and to which she was entitled under Medicaid state and federal law, rules, and regulations.

84. Following this initial denial, on October 28, 2020, one of Plaintiff GRAHAM's physicians at the University of New Mexico ("UNM") wrote to Defendant BCBS, requesting that Defendant BCBS approve the TP-IAT procedure to be performed at VCU in Richmond, Virginia, noting that this procedure was not available at the UNM. Plaintiff GRAHAM's UNM physician also noted that the requested procedure was medically necessary for Plaintiff GRAHAM.

85. On November 4, 2020, Plaintiff GRAHAM's second opinion physician at the

-18-

VCU Medical Center appealed to Defendant BCBS, on behalf of Plaintiff GRAHAM, to reconsider its refusal to approve the medical care requested by Plaintiff GRAHAM at VCU Medical Center. Plaintiff GRAHAM's physician's appeal noted that neither UNM nor the University of Colorado could perform the requested medical care, the TP-IAT procedure. Plaintiff GRAHAM's physician's appeal also noted that VCU was a Center of Excellence facility with Blue Cross/ Blue Shield, although not with Plaintiff GRAHAM's particular BCBS of NM Medicaid plan. The appeal letter stressed the urgency of the situation to Defendant BCBS.

86. On November 4, 2020, Defendant BCBS acknowledged receiving Plaintiff GRAHAM's appeal of the initial denial decision.

87. On November 12, 2020, Defendant BCBS's Medical Director, in an internal Appeal Review Note, acknowledged the requested TP-IAT procedure and then stated that Plaintiff GRAHAM's initial request was "denied as there is network adequacy for the delivery of this service." This statement was false, and its falsehood was known, or should have been known, to Defendant BCBS at the time that it was made.

88. The Appeal Review Note then went on to state:

Decision Rationale: Uphold the denial for an out-of-network benefit exception as not medically necessary. There are contracted providers available for these services and it is not an emergency. This request does not meet criteria for network benefit exclusion. This decision is based on Blue Cross Community Centennial Member Handbook, page 19, Out of Network Providers.

Member Letter Language: The request is to get a pancreas transplant from a non-contacted provider. There are contracted providers who provide these services. You are required to use providers that are a part of his health plan. The request to get care from a provider that is not part of your health plan is denied. This decision is per the Blue Cross Community Centennial Member Handbook, page 19, Out-of- Network Providers.

89.  This Appeal Review Note contained many false statements, including 1) that there were contracted providers available to perform a TP-IAT, 2) that Plaintiff GRAHAM was required to use providers that were part of Defendant BCBS's health plan, and 3) that the requested procedure was not medically necessary.   These false statements were later communicated to Plaintiff GRAHAM.

90.  Further, Defendant BCBS's own Medical Policies clearly state that autologous pancreas islet cell transplantation may be considered medically necessary as an adjunct to a total or near total pancreatectomy in patients with chronic pancreatitis.  The medical history of Plaintiff GRAHAM, known to Defendant BCBS, showeds that she was in the category of persons for whom her proposed TP-IAT would be considered "medically necessary" under Defendant BCBS's Medical Policies.   Moreover, Plaintiff GRAHAM's UNM physician had previously told Defendant BCBS that the procedure was medically necessary for Plaintiff GRAHAM.

91.  The Appeal Review Note was signed by Dr. David G. Williams, MD.   On information and belief, Dr. David G. Williams is a family physician, is not a surgeon, is not a gastroenterologist, is not a specialist in the treatment of acute and chronic pancreatitis, and is not a transplant surgeon.  Thus, Dr. David G. Williams did not have appropriate clinical expertise to understand the treatment of Plaintiff GRAHAM's condition, contrary to Defendant BCBS's contract obligations.

92.  On November 13, 2020, Defendant BCBS denied Plaintiff GRAHAM's internal appeal.  The written denial stated that the Physician Reviewer, Dr. David G. Williams, M.D., was board certified in Internal Medicine.  The appeal denial letter did not state that Dr. David G. Williams was a surgeon, or a gastroenterologist, or a specialist in the treatment

of acute and chronic pancreatitis, or qualified with the appropriate clinical expertise to understand the treatment of Plaintiff GRAHAM's condition. The appeal denial letter, therefore, was misleading through omission.

93. Further, the appeal denial letter stated that Plaintiff GRAHAM had requested a "pancreas transplant," when in fact she had not. The TP-IAT procedure is not a pancreas transplant procedure, but rather involves a pancreatectomy, or the complete removal of a patient's pancreas. The appeal denial letter, therefore, made misleading and/or false statements.

94. The appeal denial letter also falsely stated that "there are contract providers who provide this service." As of November 13, 2020, Defendant BCBS knew or should have known that there were no contract providers within Defendant BCBS's network who provided the TP-IAT procedure.

95. Both the Appeal Review Note and the appeal denial letter stated that the decision to deny Plaintiff GRAHAM's appeal was "based on Blue Cross Community Centennial Member Handbook, page 19, Out of Network Providers." Page 19 of Defendant BCBS's Centennial Member Handbook, however, is completely silent on whether Defendant BCBS forbids or will refuse to provide out-of-network services. Rather, page 19 of the Handbook only states, in relevant part, "Centennial Care does not cover services outside the United States." Thus, both the Appeal Review Note and the appeal denial letter made further misleading statements. The justifications Defendant BCBS gave Plaintiff GRAHAM for its second denial of care were, due to their falsehood, inherently unreasonable.

96. On November 20, 2020, Plaintiff GRAHAM requested a Fair Hearing from the

Fair Hearings Bureau. The Bureau assigned her Case Number 20-MC-10201. The Fair Hearing was set for December 30, 2020. The action being appealed was "Denial of Out-of-Network Total Pancreatectorny with Islet Auto Transplantation Surgery."

97.  The Fair Hearing took place as scheduled on December 30, 2020, with the parties appearing telephonically. At the time, Plaintiff GRAHAM was hospitalized and participated in the Fair Hearing from her hospital bed.

98.  Shortly after the hearing was convened, Defendant BCBS requested a brief recess. Defendant BCBS, during that recess, agreed to provide authorization to Plaintiff GRAHAM for the TP-IAT procedure to be performed at VCU Health Systems in Richmond, Virginia.

99.  Through its tactics and business practice of denying authorization for medical care, forcing claimants to request an internal appeal, Defendant BCBS engages in a pattern and practice of discouraging claimants, and of denial and delay of care, to increase its profits.

100.  Through its tactics and business practice of denying internal appeals to those claimants persistent enough to request an internal appeal, Defendant BCBS engages in a pattern and practice of discouraging claimants, and of denial and delay of care, to increase its profits.

101.  Through its tactics and business practice of forcing claimants persistent enough to request a Fair Hearing, Defendant BCBS engages in a pattern and practice of discouraging claimants, and of  denial and delay of care, to increase its profits.

102.  Through its tactics and business practice of, shortly before or at the penultimate moment before a Fair Hearing is actually commenced, then agreeing to the

-22-

medical care requested, Defendant BCBS avoids scrutiny by the State of New Mexico, and/or its administrative law judges, of its unfair and unlawful business practices, thus avoiding adverse consequences of its unfair and unlawful business practices.

III.  **Defendant BCBS's performance duties and obligations to Member insureds, including Plaintiff Julie Graham.**

103.  The performance obligations to which Defendant BCBS agreed to be bound under the Contract extend far beyond simply evaluating claims, approving claims that meet Medicaid requirements and guidelines, and paying for medical treatment.  Rather, Defendant BCBS's performance obligations included investigating and determining each Member insured's health needs and providing appropriate care as mandated  by Medicaid law and regulations, as well as assisting each Member insured to obtain that appropriate care.  Those performance obligations applied to Plaintiff GRAHAM.

104.  In addition to employing an Ombudsman who must investigate and address Member insured issues,  *see* ¶ 53, the Contract obligates Defendant BCBS, again and again, to act on behalf of and in the interests of each Member insured, including in the interests of Plaintiff GRAHAM, and to take an active role in managing and improving their health.  By way of example, these obligations are created in multiple parts of the Contract:

> – In Section 4.4, Care Coordination, obligating Defendant BCBS to provide Member insureds Care Coordination that complies with C.F.R. § 438.208 and all other requirements of the Contract (Bates HCSIC_00000562);[2]
>
> – to perform a Comprehensive Needs Assessment (including level of care) in accordance with a Member insured's needs, determining each Member insured's physical health, Behavioral Health, and/or Long-Term Care needs utilizing information from the assessment process (Bates HCSIC_00000562-

---

[2]  The Contract and Member Handbook pages referenced herein are attached hereto as Exhibit "1."

563);

– To place each Member insured in appropriate Care Coordination levels; *id.*

– To determine each Member insured's physical health, Behavior Health, and/or Long-Term Care needs (Bates HCSIC_00000563);

– To develop and implement a Comprehensive Care Plan for each Member insured (Bates HCSIC_00000563, 566, 572, 573, 576);

– To deliver ongoing Care Coordination services based on the Member insured's assessed needs and in accordance with the Comprehensive Care Plan (Bates HCSIC_00000563);

– To continuously assess and respond to the Member insured's needs for services and assistance  (Bates HCSIC_00000563);

– To ensure that a Supportive Housing Specialist shall serve as a resource and provide training to Care Coordinators  (Bates HCSIC_00000564);

– Where required by indicators that a Member insured may require nursing home care, to perform an in-person, in-home, Comprehensive Needs Assessment at the Member's primary residence  (Bates HCSIC_00000570, 571);

– To assign a specific Care Coordinator to each Member insured assigned a Care Coordination Level two (2) or three (3)  (Bates HCSIC_00000572, 573);

– To inform each Member insured of the name of her assigned Care Coordinator and a time frame during which she can expect to be contacted by this Care Coordinator (Bates HCSIC_00000566);

– To have Care Coordinators so assigned assist each Member insured, through the development and implementation of a Comprehensive Care Plan (Bates HCSIC_00000572, 573);

– To have Care Coordinators monitor the Comprehensive Care Plan to determine if the Plan is meeting the Member insured's needs (Bates HCSIC_00000572, 573);

– to have Care Coordinators perform several in-person and in-home visits with each Member insured (Bates HCSIC_00000572, 573);

– To have Care Coordinators perform several telephonic contacts with

Member insureds, at specified intervals from the most recent Comprehensive Needs Assessment (Bates HCSIC_00000572, 573);

– To assist each Member insured with quality assurance activities (Bates HCSIC_00000625);

– To offer to each Member insured Value Added Services, which are not Medicaid-funded services (Bates HCSIC_00000634);

– To comply with patient-centered initiatives created by the State, to support the State's commitment to improving health status, achieving superior clinical outcomes, and improving service delivery, while reducing administrative burdens (Bates HCSIC_00000709);

–   As part of this patient-centered initiative commitment, to focus on prevention, chronic care management, reducing emergency room visits and unnecessary hospitalizations (Bates HCSIC_00000710);

– To operate an evidence-based Home Visiting pilot program in two to four counties with poor performance for prenatal/postpartum care and/or poor birth outcomes  (Bates HCSIC_00000712);

 – To develop and have approved by the State a Member Handbook informing Member insureds of all the benefits to which they are entitled, and including information on Care Coordination and the role of Care Coordinators (Bates HCSIC_00000716-717);

– To make Community Health Workers available to Member insureds, to assist them in navigating the managed care system (Bates HCSIC_00000725);

– To assist each Member insured and Care Coordinator in ensuring the Member receives all Medically Necessary Covered Services (Bates HCSIC_00000725);

105.   Pursuant to its contract obligations, Defendant BCBS prepared and gave to its Member insureds, including Plaintiff GRAHAM, a Member Handbook.

106.   Defendant BCBS's Member Handbook repeatedly refers to its Care Coordinators, and repeatedly tells Member insureds they can seek and obtain assistance with their medical needs or medical situation from Defendant BCBS's Care Coordinators

-25-

(Bates HCSIC_00000009 17, 18, 24, 28, 32, 44, 47, 48, 51, 68, 70, 71, 84, 85).

107. Plaintiff GRAHAM received and read Defendant BCBS's Member Handbook.

108. When Plaintiff GRAHAM received Defendant BCBS's denials of her requests for care, she did not see anything in the Member Handbook that justified the denials.

109. To the best of her recollection, Plaintiff GRAHAM interacted with two Care Coordinators assigned by Defendant BCBS to assist her with obtaining care from Defendant BCBS.

110. Plaintiff GRAHAM understood that those BCBS Care Coordinators were supposed to help her with her care. Those Care Coordinators told her they would bring her care requests to other of Defendant BCBS's personnel and get back with her.

111. In speaking with Plaintiff GRAHAM, those Care Coordinators took notes and told her  they would work on getting authorization for the care she sought.

112. Plaintiff GRAHAM's impression was that those Care Coordinators were her advocates.

113. Plaintiff GRAHAM placed her trust in those Care Coordinators and in Defendant BCBS to assist her with appropriate care, and expected Defendant BCBS to assist her in getting the care she sought and to which she was entitled.

114. According to the sworn testimony of one of Defendant BCBS's Care Coordinators who interacted with Plaintiff GRAHAM, the Care Coordinator's job was to support the Member insureds in anything they needed.

115. That same Care Coordinator testified that, as a Care Coordinator, she was supposed to be a patient advocate.

-26-

## COUNT III
## BREACH OF FIDUCIARY DUTY

116.  Plaintiff GRAHAM incorporates by reference all allegations of the preceding paragraphs as if fully set forth herein and for her third count, for breach of fiduciary duty, states as follows:

117.  Defendant BCBS's role in providing health insurance to Plaintiff GRAHAM went well beyond simply evaluating and processing claims, and included obligations, in the performance of its duties, to investigate and properly evaluate the care Plaintiff GRAHAM needed, and to assist Plaintiff GRAHAM in obtaining that care within the limits imposed by federal and state law and Medicaid regulations.  Those performance obligations mandated that Defendant BCBS, in multiple ways, act on behalf of and in the interests of Member insureds, including Plaintiff GRAHAM, and created a fiduciary duty toward Member insureds, including toward Plaintiff GRAHAM.

118.  All the provisions of the Contract to which Defendant BCBS agreed, including that it would make assessments of medical conditions, provide care coordinators, and assist its Member insureds with obtaining care to which they were entitled, created a duty that Defendant BCBS not deceive its Member insureds.  Contrary to those duties, Defendant BCBS expressly deceived Plaintiff GRAHAM, on more than one occasion.

119. Defendant BCBS is the agent of the State of New Mexico and its agencies and charged with providing the Medicaid benefits to which Plaintiff GRAHAM is entitled under federal and state Medicaid law, rules, and regulations.  As the agent for the State of New Mexico and its agencies, Defendant BCBS had an obligation to faithfully and fully implement the State's Medicaid program, for the benefit of Medicaid recipients, including

Plaintiff GRAHAM.

120.  As agent for the State of New Mexico for purposes of providing Medicaid benefits to which Plaintiff GRAHAM is entitled under federal and state Medicaid law, rules, and regulations, Defendant BCBS is in a relationship with Plaintiff GRAHAM that is one of trust and confidence.  Thus, Defendant BCBS owes a fiduciary duty to Plaintiff GRAHAM as a matter of public policy and law.

121.  In her interactions with Defendant BCBS, Plaintiff GRAHAM placed her trust in Defendant BCBS to fairly evaluate her medical condition and to provide her the care to which she was entitled under Medicaid law and regulations.

122.  A fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence.

123.  Defendant BCBS, in equity and good conscience, was bound to act in good faith with due regards of the interests of Plaintiff GRAHAM and its other Member insureds.

124.  Defendant BCBS owed Plaintiff GRAHAM an independent fiduciary duty of the highest order or degree to implement the purposes of federal and state Medicaid law, rules, and regulations, whereby it provides benefits to Medicaid recipients, for profit, on behalf of the State of New Mexico, thus acting as an arm of the State of New Mexico, with a commensurate obligation to give full and complete effect to federal and state Medicaid law, rules, and regulations and their accompanying benefits to medically fragile citizens.

125.  In addition, under the great public interest in providing assistance to medically fragile Medicaid recipients such as Plaintiff GRAHAM, Defendant BCBS as the insurer of Plaintiff GRAHAM has a fiduciary duty to its own insured, Plaintiff GRAHAM.  Defendant

-28-

BCBS's fiduciary duty is of the highest order in regard to Medicaid claims, i.e., the duties and standard of care required of a true fiduciary or of one designated by the State of New Mexico to implement public policy and provide care for its most vulnerable citizens.

126.  Moreover, the compulsory nature of participation in the Blue Cross Community Centennial program in order to receive Medicaid benefits due to a medically fragile citizen make the relationship between Plaintiff GRAHAM and Defendant BCBS inherently unbalanced.  The adhesive nature of the relationship places Defendant BCBS in a superior bargaining position to insureds such as Plaintiff GRAHAM.  The availability of punitive damages is thus compatible with a recognition of Defendant BCBS's underlying public obligations and reflects an attempt to restore balance in the relationship.

127.  Defendant BCBS and Plaintiff GRAHAM, who was severely ill during the time she was a Member insured, were not in an equal bargaining position, where Defendant BCBS was in a vastly superior bargaining position than Plaintiff GRAHAM.

128.  Defendant BCBS knowingly, willfully, maliciously or with reckless disregard for the rights of Plaintiff GRAHAM and other New Mexico insureds, adopted and implemented claims handling protocols and business practices with the intent to defeat, violate, or avoid full implementation of the remedial purposes of the federal and state Medicaid law, rules, and regulations pursuant to which Defendant BCBS provides, for profit, benefits to Plaintiff GRAHAM on behalf of the State of New Mexico.

129.  Defendant BCBS accorded greater consideration to its own interests over that of the interests of Plaintiff GRAHAM, a Medicaid recipient and beneficiary entitled to the full protection and benefit of federal and state Medicaid law, rules, and regulations.

130.  Defendant BCBS, in the performance of its duties, failed to consider or refused

to consider the interests of Plaintiff GRAHAM, which it was obligated to investigate and fairly consider, and rather considered its own interests.

131.  Defendant BCBS breached its fiduciary duty to Plaintiff GRAHAM.

132.  As a direct and proximate result of this breach, Plaintiff GRAHAM has been injured, in an amount to be shown at trial.

WHEREFORE, Plaintiff GRAHAM has stated her First Amended Complaint for Breach of Fiduciary Duty, and respectfully requests that the Court award her compensatory damages, punitive damages as allowed by law, prays the Court for certification of a class as requested in her original Complaint, and prays for any other relief the Court deems just and proper.

Respectfully Submitted,

Law Office of Pierre Levy, LLC
Attorneys for Plaintiff Julie Graham

By: _____
    Pierre Levy, Esq.
    P.O. Box 2505
    Santa Fe, New Mexico 87504
    (505) 633-4113
    pierre@levylaw.net

**Certificate of Service**

I hereby certify that I served the foregoing
to counsel of record for Defendants through
the Court's CM/ECF system on the date of
filing, and e-mailed a courtesy copy on the same
day to the following:

-30-

Brian Kavanaugh
Christopher M. Assise
Camille Sanches

SIDLEY AUSTIN LLP
1 S. Dearborn Street, 9th Floor
Chicago, Illinois 60603
bkavanaugh@sidley.com
cassise@sidley.com
csanches@sidley.com

Christina Muscarella Gooch
SUTIN THAYER & BROWNE APC
P.O. Box 1945
Albuquerque, New Mexico 87103-1945
tmg@sutinfirm.com

Pierre Levy

DocuSign Envelope ID: 55D59DD7-49E7-4050-BC43-58F943571166



**State of New Mexico Human Services Department**

**Medicaid Managed Care Services Agreement**

**Among**

**New Mexico Human Services Department,**

**New Mexico Behavioral Health Purchasing Collaborative**

**and**

**HCSC Insurance Services Company, operating as Blue Cross and Blue Shield of New Mexico**



**PSC 18-630-8000-0033 A2**
**CFDA 93.778**

HCSCIS_00000495

# EXHIBIT 1

4.3.3.1.1    The Members loses Medicaid eligibility; or

4.3.3.1.2    At any point in the Fair Hearing process when it is determined that such removal is in the best interest of the Member and/or HSD.

4.3.4    Effective Date of Disenrollment

All HSD approved disenrollment requests shall be effective on or before the first Calendar Day of the second month following the month of the request for disenrollment unless otherwise indicated by HSD. In all instances, the effective date shall be indicated on the termination record sent by HSD to the CONTRACTOR.

4.3.5    The CONTRACTOR shall immediately update its enrollment roster based on any changes made in accordance with this Section 4.3 of this Agreement.

## 4.4    Care Coordination

4.4.1    General

4.4.1.1    The CONTRACTOR shall provide Care Coordination that complies with 42 C.F.R. § 438.208 and all requirements of this Agreement.

4.4.1.2    The CONTRACTOR shall design and implement Care Coordination that includes the following steps addressed in this Section 4.4 of this Agreement, unless otherwise stated in 4.13.2 of this Agreement for a Member enrolled in a Health Home or 4.4.19.1 of this Agreement for a Member in a Full Delegation model of care coordination;

4.4.1.2.1    Perform the HSD standardized Health Risk Assessment and determine if the Member's may need a comprehensive needs assessment;

4.4.1.2.2    Place Members in the Care Coordination level(s) in accordance with standards in Section 4.4.3 of this Agreement;

4.4.1.2.3    Perform CNA (including level of care) for each Member who meets the conditions in Section 4.4.5 of this Agreement and complete the Community Benefit and Services Questionnaire (CBSQ) and Community Benefits Member Agreement (CBMA), and inform each assessed Member of community benefits in accordance with their needs;

HCSCIS_00000562

4.4.1.2.4    Determine the Members' physical health, Behavioral Health and/or Long-Term Care needs utilizing information from the assessment process;

4.4.1.2.5    Develop and implement a CCP based on the Member's individual needs and preferences in accordance with Section 4.4.9 of this Agreement;

4.4.1.2.6    Deliver ongoing Care Coordination services based on the Member's assessed need and in accordance with the CCP and contractual obligations for frequency of contact with the Member in accordance with Section 4.4.10; and

4.4.1.2.7    Continuously assess and respond to the Member's needs for services and assistance.

4.4.1.3    The CONTRACTOR shall ensure that the CSA is included in Care Coordination processes described in this Section 4.4 including comprehensive needs assessments and care planning for those Members who utilize CSAs. For further information on CSAs, please refer to Section 4.8.10 of this Agreement.

4.4.1.4    In coordinating Members' care, the CONTRACTOR shall ensure that each Member's privacy is protected consistent with the State and federal confidentiality requirements, including those listed in 45 C.F.R.s § 160 and § 164 and 42 C.F.R. § 2.

4.4.1.5    Each Member has the right to refuse to participate in Care Coordination. In the event a Member refuses, the CONTRACTOR shall have the Member sign an HSD approved Care Coordination declination form. If a Member refuses to sign the care coordination declination form, the CONTRACTOR shall document such refusal in the Member's record. The Member who has signed, or refused to sign, a care coordination declination form will not be assigned to Care Coordination level 2 or 3, but will be monitored by the CONTRACTOR per Section 4.4.4 of this Agreement. Members must participate in an annual CNA at a minimum in order to certify/renew their NF LOC.

4.4.1.6    The CONTRACTOR shall send the Member written notification within ten (10) Calendar Days of receiving the Member's enrollment file that explains how the

HCSCIS_00000563

Member can reach the Care Coordination unit for assistance with concerns or questions pending the HRA and Comprehensive Needs Assessment process.

4.4.1.7    Supportive Housing

The CONTRACTOR shall have a full-time Supportive Housing Specialist dedicated to this Agreement to work with Members to assess housing needs and identify appropriate resources in order to help them attain and maintain housing.

4.4.1.7.1    The Supportive Housing Specialist shall serve as the internal resource to provide training and technical assistance to the CONTRACTOR's care coordinators.

4.4.1.7.2    Supportive Housing specifically targets the following populations:

- Individuals who are chronically homeless, as defined by the U.S. Department of Housing and Urban Development (HUD) or precariously housed;
- Individuals with frequent or lengthy institutional care;
- Individuals with serious mental illness or chronic substance use disorders, crisis stabilization, high emergency department or inpatient utilization;
- Individuals with frequent or lengthy adult residential care or treatment stays;
- Individuals with LTSS and frequent turnover of in-home caregivers or Providers; and
- Individuals at highest levels of risk for expensive care and negative outcomes, defined by a Predictive Risk Intelligence System (PRISM) risk score of 1.5 or higher or similar risk measures.

4.4.2    Health Risk Assessment (HRA)

4.4.2.1    The CONTRACTOR shall conduct the HSD standardized Health Risk Assessment (HRA) on all Members who are: (i) newly enrolled in Centennial Care; and (ii) who are not in CCL2 or CCL3 who have a change in health condition that requires a higher level of care, per HSD guidelines and processes. The HRA is conducted for the purpose of: (i) introducing the CONTRACTOR to

2 or 3. The CONTRACTOR will perform quarterly Claims mining for these Members and will renew attempts to reach the Member if Claims mining indicates a possible need for Care Coordination unless the Member has declined Care Coordination.

4.4.2.6.2    If the CONTRACTOR has made three documented attempts to contact and has reached the Member at least once, but the Member fails to engage in either the HRA or CNA completion, then the Member is categorized as "difficult to engage" (DTE) and is not assigned to Care Coordination level two (2) or level three (3). The CONTRACTOR will perform quarterly Claims mining for these Members and will renew attempts to reach the Member if Claims mining indicates a possible need for Care Coordination.

4.4.3    Assignment to Care Coordination Levels

4.4.3.1    The HRA shall determine if a Member requires a CNA to determine if the Member should be assigned to Care Coordination level two (2) or level three (3).

4.4.3.2    Within seven (7) Calendar Days of completion of the HRA, Members who have been identified as needing a Comprehensive Needs Assessment shall be informed of such action. If the Member is enrolled in a Health Home, refer to Agreement Section 4.13.2.

4.4.3.3    Within ten (10) Calendar Days of completion of the HRA, Members requiring a Comprehensive Needs Assessment shall receive:

4.4.3.3.1    Contact information for the CONTRACTOR's Care Coordination unit;

4.4.3.3.2    The name of the assigned care coordinator (if applicable); and

4.4.3.3.3    A time frame during which the Member can expect to be contacted by the Care Coordination unit or individual care coordinator to complete the Comprehensive Needs Assessment.

4.4.3.4    Members who are identified as NOT needing a Comprehensive Needs Assessment shall be monitored by the Care Coordination unit according to the provisions in Section 4.4.4 of this Agreement.

4.4.3.5    Care Coordination Level Two (2) and Level Three (3). For Members meeting one of the indicators below, the CONTRACTOR shall conduct a Comprehensive

71

DocuSign Envelope ID: 55D59DD7-49E7-4060-BC43-58F943571166

PSC 18-630-8000-0033 A2 CC 2.0

Needs Assessment (further explained in section 4.4.5 of this Agreement) to determine whether the Member should be in Care Coordination level two (2) or level three (3):

4.4.3.5.1 Is a high-cost user as defined by the CONTRACTOR;

4.4.3.5.2 Is in out-of-State medical placements;

4.4.3.5.3 Is a dependent child in out-of-home placements;

4.4.3.5.4 Is a transplant patient;

4.4.3.5.5 Is identified as having a high risk pregnancy; Section 4.4.3.5.5.1

4.4.3.5.5.1 Pregnant Members eighteen (18) years of age and younger

4.4.3.5.6 Has a Behavioral Health diagnosis including substance abuse that adversely affects the Member's life;

4.4.3.5.7 Is medically fragile;

4.4.3.5.8 Is designated as ICF/MR/DD;

4.4.3.5.9 Has frequent emergency room use, defined as two (2) or more emergency room visits in a six (6) month period;

4.4.3.5.10 Has an acute or terminal disease;

4.4.3.5.11 Is readmitted to the hospital within thirty (30) Calendar Days of discharge;

4.4.3.5.12 Has other indicators as prior approved by HSD;

4.4.3.5.13 Is a Medically Frail adult member;

4.4.3.5.14 Has mild cognitive deficits requiring prompting or cueing;

4.4.3.5.15 Has co-morbid health conditions;

4.4.3.5.16 Requires assistance with two (2) or more ADLs or IADLs living in the community; and

4.4.3.5.17 Has poly-pharmaceutical use, defined as simultaneous use of six (6) or more medications from different drug classes and/or simultaneous use of three (3) or more medications from the same drug class.

4.4.4 <u>Requirements for Members Not Assigned to Care Coordination Level Two (2) or Level Three (3)</u>

4.4.4.1 Members who are not assigned to Care Coordination level two (2) or level three (3) shall receive, at a minimum, the following:

72

HCSCIS_00000567

Member the consequences of such risks, strategies to mitigate the identified risks and the Member's decision regarding his or her acceptance of risk;

4.4.5.5.4    Assess disease management needs including identification of disease state, need for targeted intervention and education and development of appropriate intervention strategies;

4.4.5.5.5    Determine a social profile including but not limited to: family and kinship supports; living arrangements; demographics; transportation; employment; natural supports; financial resources (other insurance, food, utilities); Medicare services; other community resources in place such as senior companion or meals-on-wheels; living environment (related to health and safety); IADLs, Individualized Education Plan (IEP); Individual Service Plan (ISP) for DD or medically fragile Members (if applicable);

4.4.5.5.6    Identify possible suicidal and/or homicidal thinking and/or planning;

4.4.5.5.7    Identify cultural information including language and translation needs and utilization of ceremonial or natural healing techniques;

4.4.5.5.8    Ask the Member for a self-assessment regarding the Member's condition(s) and service needs; and

4.4.5.5.9    Identify if the Member is receiving the Alternative Benefit Plan (ABP) and meets the definition and criteria of Medically Frail or is otherwise ABP Exempt as described in Section 4.5.1.5 of this Agreement, notify the Member that he/she may be ABP Exempt, explain the benefit differences for ABP Exempt Members and facilitate his/her movement into the ABP Exempt benefit package (the Covered Services included in Attachment 2) at the Member's choice.

4.4.5.6    The CNA shall be conducted at least annually for CCL2 Members and at least semi-annually for CCL3 Members, or as the care coordinator deems necessary due to a request from the Member, provider or family member or as a result of change in health status or triggering event as outlined in Section 4.4.3.5.

4.4.5.7    Nursing Facility Level of Care

PSC 18-630-8000-0033 A2 CC 2.0

4.4.5.7.1    For Members who have indicators that may warrant a nursing facility level of care, the CONTRACTOR shall conduct an in-person, in-home, CNA at the Member's primary residence. The CONTRACTOR shall use the New Mexico Medicaid NF LOC Criteria and instructions to determine nursing facility level of care eligibility for all Members.

4.4.5.7.2    For Members in the Alternative Benefit Plan (ABP) who meet nursing facility level of care, notify the Member that he/she may be ABP Exempt, explain the benefit differences for ABP Exempt individuals and facilitate his/her movement into the ABP exempt benefit package (the Covered Services included in Attachment 2) at the Member's choice.

4.4.5.7.3    The CONTRACTOR shall conduct internal random sample audits of both facility and community benefit NF LOC determinations based on HSD NF LOC instructions and tool guidelines each quarter. The results and findings will be reported to HSD along with any Quality Improvement Plan Performance Improvement Plan, if necessary.

4.4.6    Requirements for Care Coordination Level Two (2)

4.4.6.1    Based on the Comprehensive Needs Assessment, the CONTRACTOR shall assign Care Coordination level two (2), at a minimum, to Members with one of the following:

4.4.6.1.1    Co-morbid health conditions;

4.4.6.1.2    High emergency room use, defined as three (3) or more emergency room visits in thirty (30) days;

4.4.6.1.3    A mental health or substance abuse condition causing moderate functional impairment;

4.4.6.1.4    Requiring assistance with two (2) or more ADLs or IADLs living in the community at low risk;

4.4.6.1.5    Mild cognitive deficits requiring prompting or cues;

4.4.6.1.6    Poly-pharmaceutical use is defined as simultaneous use of six (6) or more medications from different drug classes and/or simultaneous use of three (3) or more medications from the same drug class; and

4.4.4.1.1    Review of Claims data and utilization of predictive modeling software at least quarterly to determine if the Member had or may have a change in health status and is in need of a health risk assessment and/or Comprehensive Needs Assessment for potential assignment to higher level of Care Coordination.

4.4.5    <u>Comprehensive Needs Assessment for Care Coordination Level Two (2) and Level Three (3)</u>

4.4.5.1    The CONTRACTOR shall perform an in-person, in-home Comprehensive Needs Assessment on all Members identified for Care Coordination by an HRA, or who are already receiving Care Coordination level two (2) or level three (3) at the Member's primary residence. The CNA may be conducted outside of the Member's primary residence under the following conditions: The Member is homeless, or in a transition home; The Member is part of the jail involved population preparing for release; The Member is a newborn in an inpatient setting; or The Member is in a Health Home or a Full Delegation Model. The visit may occur at another location only with HSD approval. For Members who reside in a nursing facility, rather than conduct a CNA, the CONTRACTOR shall ensure the MDS is completed and collect supplemental information related to Behavioral Health needs and the Member's interest in receiving HCBS.

4.4.5.2    For all Members the CONTRACTOR shall:

4.4.5.2.1    Schedule a CNA within fourteen (14) Calendar Days; and

4.4.5.2.2    Complete the CNA within thirty (30) Calendar Days of the HRA if required, unless the Member is in a Health Home and/or using the Treat First model of care.

4.4.5.3    The CONTRACTOR shall:

4.4.5.3.1    Continue attempts to contact Members quarterly to complete the CNA or sign the HSD approved Care Coordination declination form. Members may be categorized as "difficult to engage" (DTE), if reached at least once, when an additional two attempts to contact are documented by the CONTRACTOR.

73

HCSCIS_00000568

DocuSign Envelope ID: 55D59DD7-49E7-406D-BG43-58F943571166    Case 1:22-cv-00305-RG-GJF    Document 80    Filed 01/05/26    Page 41 of 69

PSC 18-630-8000-0033 A2 CC 2.0

4.4.6.1.7    High risk pregnancy including pregnant Members who are eighteen (18) years and younger.

4.4.6.2    The CONTRACTOR shall assign a specific care coordinator to each Member assigned to Care Coordination level two (2).

4.4.6.3    Care coordinators for Members in Care Coordination level two (2) shall provide and/or arrange for the following Care Coordination services:

4.4.6.3.1    Development and implementation of a CCP;

4.4.6.3.2    Monitoring of the CCP to determine if the CCP is meeting the Member's identified needs;

4.4.6.3.3    Assessment of need for assignment to a Health Home;

4.4.6.3.4    Targeted Health Education, including disease management, based on the Member's individual diagnosis (as determined by the Comprehensive Needs Assessment);

4.4.6.3.5    Annual Comprehensive Needs Assessment (according to the standards in Section 4.4.5 of this Agreement) to determine if the CCP is appropriate and if a higher or lower level of Care Coordination is needed;

4.4.6.3.6    Semi-annual in-person and in-home visits with the Member;

4.4.6.3.7    Two telephonic contacts shall occur as follows: (1) 60-90 Calendar Days and (2) 240-270 Calendar Days, from the most recent CNA;

4.4.6.3.8    The most recent CNA completion date serves as the anchor date, or begin date, for assessing the timeliness of in-person, in-home visits and telephonic contacts. When a new CNA is conducted, that becomes the new anchor date; and

4.4.6.3.9    Timeliness Schedule:

| Touchpoints for CCL2 | Timeliness Deadlines |
| --- | --- |
| Annual CNA | Anchor date |
| Telephonic contact | 60-90 Calendar Days |
| In-person, in-home visit | 150-180 Calendar Days |
| Telephonic contact | 240-270  Calendar Days |

77

DocuSign Envelope ID: 55D59DD7-49E7-4060-BG43-58F943571166

PSC 18-630-8000-0033 A2 CC 2.0

After touchpoint attempts have been made and documented, Members may be categorized as "difficult to engage" (DTE) if reached at least once for their annual CNA, telephonic contact, or in-person, in-home visit when two, subsequent attempts to contact are documented by the CONTRACTOR.

4.4.6.3.9.1    The CONTRACTOR will continue attempts to reach the member quarterly or until the Member has signed, or refused to sign, the HSD approved Care Coordination declination form.

4.4.7    Requirements for Care Coordination Level Three (3)

4.4.7.1    Based on the Comprehensive Needs Assessment, the CONTRACTOR shall assign to Care Coordination level three (3), at a minimum, to Members with one the following:

4.4.7.1.1    Who are medically complex or fragile, as defined by the CONTRACTOR;

4.4.7.1.2    Excessive emergency room use as defined as four (4) or more emergency room visits in a twelve (12) month period;

4.4.7.1.3    With a mental health or substance abuse condition causing high functional impairment;

4.4.7.1.4    With untreated substance dependency based on the current DSM or other functional scale determined by the State;

4.4.7.1.5    Requiring assistance with two (2) ADLs or IADLs living in the community at medium to high risk;

4.4.7.1.6    With significant cognitive deficits; and/or

4.4.7.1.7    With contraindicated pharmaceutical use.

4.4.7.2    The CONTRACTOR shall assign a specific care coordinator to each Member in Care Coordination level three (3).

4.4.7.3    Care coordinators for Members in Care Coordination level three (3) shall provide and/or arrange for the following Care Coordination services:

4.4.7.3.1    Care coordination services listed in Sections 4.4.6.3.1-4.4.6.3.9 of this Agreement;

4.4.7.3.2    Semi-annual CNA (according to the standards in Section 4.4.5 of this Agreement) to determine if the CCP is appropriate and determine if a lower

HCSCIS_00000573

the CONTRACTOR to assist a Member who has been referred, regardless of referral source.

4.4.8.5    For Members identified through notification of hospital admission, the CONTRACTOR shall work with the hospital discharge planner to determine needed services upon discharge. The CONTRACTOR shall complete all applicable screening and/or intake processes as necessary to facilitate timely transition to the most integrated and cost effective care setting appropriate to meet the Member's needs, including engaging Primary Care Providers and increasing targeted Care Coordination activities, per Section 4.4.16.

4.4.8.6    The CONTRACTOR's agreement(s) with hospitals shall require the facility to notify the CONTRACTOR within one (1) Business Day of the date a Member is admitted.

**4.4.9    Care Plan Requirements**

4.4.9.1    The CONTRACTOR shall develop and implement CCPs for Members in Care Coordination levels two (2) and level three (3).

4.4.9.2    The CONTRACTOR shall develop and authorize the CCP within fourteen (14) Business Days of completion of the initial Comprehensive Needs Assessment, unless the Member is in a Treat First model of care. The CONTRACTOR shall authorize services in the CCP pursuant to section 4.12.12.

4.4.9.2.1    For Members in the Treat First model of care, the CCP shall be completed within fourteen (14) Business Days of the completion of four (4) therapeutic Encounters, but no later than thirty (30) Business Days of the CNA completion.

4.4.9.3    For Members in Care Coordination level two (2) and level three (3), the care coordinator shall ensure at a minimum that the Member and Representative participate in developing the CCP.

4.4.9.4    The CONTRACTOR shall ensure that care coordinators consult with the Member's PCP, specialists, Behavioral Health Providers, other Providers and interdisciplinary team experts, as needed when developing the CCP.

HCSCIS_00000576

4.6.2.1.6    Conduct employer-related activities, such as assisting a Member in identifying a designated EOR (as appropriate);

4.6.2.1.7    Identify and resolve issues related to the implementation of the CCP;

4.6.2.1.8    Assist the Member with quality assurance activities to ensure implementation of the Member's SDCB care plan and utilization of the authorized budget;

4.6.2.1.9    Recognize and report Critical Incidents, including Abuse, neglect, exploitation, Emergency Services, law enforcement involvement and environmental hazards; and

4.6.2.1.10    Monitor quality, including but not limited to: (i) the adequacy of Member-to-support broker ratios; (ii) the relationship between support brokers and care coordinators; and (iii) the services provided by support brokers.

4.6.2.2    The care coordinator shall work with the Member to determine the appropriate level of assistance necessary to recruit, interview, hire Providers and provide the necessary assistance for successful program implementation.

4.6.3    Support Broker Functions

4.6.3.1    The CONTRACTOR shall perform, or contract with a qualified vendor to perform, the support broker functions for Members electing the SDCB.

4.6.3.1.1    If the CONTRACTOR performs the support broker functions, in addition to its employed Support Brokers, it must also offer the Member a choice of at least two additional Support Broker agencies.

4.6.3.1.2    If the CONTRACTOR does not perform the support broker functions, it must offer the member a choice of multiple contracted support broker agencies.

4.6.3.2    The CONTRACTOR shall be responsible for ensuring that all applicable requirements are met. At minimum, the CONTRACTOR (either directly or through a Subcontractor) shall perform the following support broker functions:

4.6.3.2.1    Educate Members on how to use self-directed supports and services and provide information on program changes or updates;

HCSCIS_00000625

4.6.12.5     The CONTRACTOR shall reimburse the FMA for authorized SDCB services provided by Providers at the appropriate rate for the self-directed HCBS, which includes applicable payroll taxes.

## 4.7   Value Added Services

4.7.1     The CONTRACTOR shall offer to its Members Value Added Services that are not Covered Services. The CONTRATOR may offer Value Added Services in the ABP.

4.7.2     Value Added Services shall be approved in writing by HSD to supplement the Covered Services provided to such Members.

4.7.3     The cost of Value Added Services will not be included when HSD determines the Capitation Rate. All Value Added Services shall be identifiable and measurable through the use of unique payment and/or processing codes, approved by HSD. At the CONTRACTOR's request, HSD may assist in identifying a compliant code.

4.7.4     Value Added Services are not Medicaid-funded services; therefore, there is neither Appeal nor Fair Hearing rights. The CONTRACTOR shall send the Member a notification letter if the requested Value Added Service required prior approval and was not approved, i.e., denied.

4.7.4.1     Denial of a Value Added Service will not be considered an Adverse Benefit Determination for purposes of Appeals or Fair Hearings.

## 4.8   Provider Network

4.8.1     <u>General Requirements</u>

4.8.1.1     The CONTRACTOR shall comply with the requirements specified in 42 C.F.R.s § 438.12, § 438.14, § 438.207(c), § 438.214 and all applicable State requirements regarding provider networks. The CONTRACTOR shall have policies and procedures that reflect these requirements. The CONTRACTOR shall also:

4.8.1.1.1     Establish and maintain a comprehensive network of Providers capable of serving all Members who enroll in the CONTRACTOR's MCO. The CONTRACTOR is required to enter into new contracts with providers for

### 4.13  Patient-Centered Initiatives

The CONTRACTOR shall comply and cooperate with all HSD patient-centered initiatives. The purpose of the patient-centered initiatives is to support HSD's commitment to improving health status, achieving superior clinical outcomes and improving service delivery, while reducing administrative burdens.

#### 4.13.1  Patient-Centered Medical Home (PCMH)

4.13.1.1    The CONTRACTOR shall work with PCP Contract Providers to implement PCMH programs. PCMHs are not required to attain NCQA or Joint Commission recognition but are encouraged to achieve recognition as soon as possible. PCMHs shall incorporate the following principles:

4.13.1.1.1    Every Member has a selected Primary Care Provider;

4.13.1.1.2    Care is provided by a physician-directed team that collectively cares for the Member;

4.13.1.1.3    The PCMH: (i) performs Care Coordination functions in accordance with Section 4.4 of this Agreement or (ii) is engaged with the Member's assigned care coordinator, as applicable, provided by the CONTRACTOR in arranging and coordinating services; and

4.13.1.1.4    Care is coordinated and/or integrated across all aspects of health care.

4.13.1.2    The CONTRACTOR shall support transition and ensure engagement of Primary Care practices to PCMHs by focusing on the following areas:

4.13.1.2.1    Screening/identification and targeting of PCMH participants, including, but not limited to: (i) Members with an identified disease state/condition aligned with the CONTRACTOR's proposed disease management programs; and (ii) Members identified with a higher level of need for continuity of care, such as those with a Behavioral Health diagnosis, including substance abuse that adversely effects the Member's life, co-morbid health conditions or Members receiving NF LOC;

4.13.1.2.2    Continuous, accessible, comprehensive and coordinated care using community-based resources as appropriate, enhanced access including, but not limited to, extended office hours outside of 8:00 AM to 5:00 PM

HCSCIS_00000709

(Mountain Time), open scheduling and alternative communication models, such as web-based or telephonic options;

4.13.1.2.3    Focusing care on prevention, chronic care management, reducing emergency room visits and unnecessary hospitalizations and improving care transitions;

4.13.1.2.4    Using access and quality measures (HEDIS and surveys), as defined by HSD;

4.13.1.2.5    Demonstrating improved health status and outcomes for Members as defined by HSD;

4.13.1.2.6    Using measures to analyze the delivery of patient-centered services and quality of care, over and underutilization of services, disease management strategies and outcomes of care;

4.13.1.2.7    Promoting adoption of all use of HIT and supporting integration between Primary Care and other Providers of Covered Services through Care Coordination, as well as electronic data exchange; specifically, data that may be used to support decision making and continuous quality improvement, which may include the release of CONTRACTOR authorization data as directed by HSD; and

4.13.1.2.8    Promoting integration between Primary Care and other Providers of Covered Services through Care Coordination, as well as data exchange; specifically, data that may be used to support decision making and continuous quality improvement, which may include the release of Medicaid Claims/Encounter Data, MCO Claims/Encounter Data and MCO authorization data as directed by HSD.

4.13.1.3    The CONTRACTOR shall report PCMH activities and expenditures to HSD shall be in a format and methodology specified by HSD.

4.13.1.4    Any amounts expended by the CONTRACTOR implementing or operating the PCMH initiative shall be counted as direct medical expenses as defined in Section 7.2 of this Agreement.

215

4.13.2.7.2    The Claim payment shall be made, per Section 4.19 Claims Management.

4.13.3    New Mexico's Health Information Exchange (HIE)

4.13.3.1    The CONTRACTOR shall make its Centennial Care health plan's health information available to the HIE and use the HIE to exchange electronic health information with other Providers and health plans in accordance with applicable State and federal law.

4.13.3.2    The CONTRACTOR shall issue monthly payments to the New Mexico Health Information Collaborative (NMHIC), or its successor, as operator of the HIE. The costs associated with the HIE or its successor are included in the CONTRACTOR's Capitation Rate.

4.13.3.2.1    The payment shall be an amount based on the CONTRACTOR's Centennial Care membership for that month using a PMPM set by HSD.

4.13.3.2.2    The payment shall be made no later than ten (10) Calendar Days, or at HSD's discretion, following the CONTRACTOR's receipt of the monthly Capitation Payment for its membership from HSD.

4.13.4    Home Visiting Pilot Program

4.13.4.1    The CONTRACTOR shall operate an evidence-based Home Visiting (HV) pilot program in two to four counties with poor performance for prenatal/postpartum care and/or poor birth outcomes, such as high rate of preterm births and high rate of low birth weight infants or other risk factors as determined by HSD. HSD will designate the counties to be served and the evidence-based HV model to be utilized. The program will be voluntary for Centennial Care Members. The CONTRACTOR shall include methods to incentivize participation.

4.13.4.2    New Mexico has an extensive home visiting network throughout the State. The CONTRACTOR shall contract with the high-fidelity HV models that are operating in the designated counties to deliver a defined set of Medicaid-reimbursable services.

4.13.4.3    The CONTRACTOR shall work collaboratively with Department of Health (DOH) and Children, Youth and Families Department (CYFD) to implement the program, develop workforce and provider capacity to serve the Members

DocuSign Envelope ID: 55D59DD7-49E7-4060-BC43-58F943571166    Case 1:22-cv-00305-KG-GJF    Document 80    Filed 01/05/26    Page 49 of 69

PSC 18-630-8000-0033 A2 CC 2.0

the system; and (ii) provide all subsequent Member Materials to the Member in such format unless the Member requests otherwise.

4.14.2.9    The CONTRACTOR shall provide written notice to Members of any material changes to written Member Materials previously sent at least thirty (30) Calendar Days before the effective date of the change.

4.14.2.10    The CONTRACTOR must comply with Section 1557 of the Patient Protection and Affordable Care Act, as codified at 45 C.F.R. § 92, with regard to nondiscrimination on the basis of race, color, national origin, sex, age or disability in health programs or activities receiving federal financial assistance.

4.14.3    Member Handbook

4.14.3.1    The Member handbook shall be prior approved by HSD and be in a format that is easily understood. The Member handbook shall include a table of contents, HSD-approved definitions for the terms specified in 42 C.F.R. § 438.10(c)(4)(i) and defined in the Agreement or referenced in the NM Managed Care Policy Manual, Section 3.2, and at a minimum comply with the following:

4.14.3.1.1    Describe the amount, duration and scope of all benefits, services and goods included in and excluded from coverage in sufficient detail to ensure that Members understand the benefits to which they are entitled. Include a separate Section and/or addendum that describes the provisions and limitations (including amount, duration scope and cost-sharing) of the ABP, the qualifications and conditions for ABP exemptions, the benefit and cost-sharing differences for an ABP Exempt Member and the process by which a Member can self-identify as potentially an ABP Exempt Member and voluntarily opt-out of the ABP;

4.14.3.1.2    Include information on how to access all services, including, but not limited to, EPSDT services, dental services, non-emergency transportation services, Behavioral Health services and LTC services;

4.14.3.1.3    Include information about the PCP, including: (i) how to select/change PCP and (ii) the role of the PCP and the procedures to be followed to obtain needed services;

221

PSC 18-630-8000-0033 A2 CC 2.0

4.14.3.1.4    Include information about Care Coordination, including the role of care coordinators;

4.14.3.1.5    Include information on how to access services when out of State;

4.14.3.1.6    Describe how to report suspected Fraud and Abuse;

4.14.3.1.7    Describe how to access language assistance services for individuals with LEP and auxiliary aids and services, including additional information in alternative formats or languages;

4.14.3.1.8    Include information on the circumstances/situations under which a Member may be billed for services or assessed charges or fees; specifically that the provider may not bill a Member or assess charges or fees except: (i) if a Member self-refers to a specialist or other provider within the network without following CONTRACTOR procedures (e.g., without obtaining prior authorization) and the CONTRACTOR denies payment to the provider, the provider may bill the Member; (ii) if a provider fails to follow the CONTRACTOR's procedures, which results in nonpayment, the provider may not bill the Member and (iii) if a provider bills the Member for non-Covered Services or for self-referrals, he or she shall inform the Member and obtain prior agreement from the Member regarding the cost of the procedure and the payment terms at time of service;

4.14.3.1.9    A statement that failure to pay for non-Covered Services will not result in a loss of Medicaid benefits;

4.14.3.1.10    RESERVED;

4.14.3.1.11    Detail procedures for obtaining benefits including, services for which prior authorization or a referral is required and the methods for obtaining both;

4.14.3.1.12    Explain any restrictions on Member's freedom of choice among Contract Providers;

4.14.3.1.13    Explain how to access after-hours, emergency and Post-Stabilization Services, to also include: (i) what constitutes an Emergency Medical Condition, Emergency Services and Post-Stabilization Services as per definitions in 42 C.F.R. § 438.114(a); (ii) the fact that prior authorization is

HCSCIS_00000717

4.14.11.3.3    The benefits of completing Advance Directives;

4.14.11.3.4    The availability and benefits of Health Homes;

4.14.11.3.5    Include information about the full array of EPSDT services, the importance and availability of EPSDT services, the benefits of preventive services, federal requirements for screenings and well-child examinations and how to access services;

4.14.11.3.6    The importance of and schedules for screenings for cancer, high blood pressure and diabetes;

4.14.11.3.7    The risks associated with the use of alcohol, tobacco and other substances and available products and counseling, i.e. smoking cessation products;

4.14.11.3.8    The concepts of managed care;

4.14.11.3.9    The use of the PCP as the primary source of medical care; and

4.14.11.3.10   The role of the care coordinator and how to contact the Care Coordination unit.

4.14.11.4    The CONTRACTOR shall make materials available for review by HSD upon request.

4.14.11.5    The CONTRACTOR shall notify Members of the schedule of educational events and shall post such information on its website.

4.14.11.6    The CONTRACTOR's Health Education Plan shall also include how the CONTRACTOR will work with Community Health Workers to improve Member Health Literacy. Specifically, the CONTRACTOR shall make Community Health Workers available to Members to, among other things:

4.14.11.6.1    Offer interpretation and translation services;

4.14.11.6.2    Provide culturally appropriate Health Education and information;

4.14.11.6.3    Assist Members in navigating the managed care system;

4.14.11.6.4    Assist in obtaining information about and access to available community resources;

4.14.11.6.5    Provide informal counseling and guidance on health behaviors; and

4.14.11.6.6    Assist the Member and care coordinator in ensuring the Member receives all Medically Necessary Covered Services.

230

HCSCIS_00000725

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date of signature by all parties.

**CONTRACTOR**

By: Sharon Huerta _____    Date: 3/25/2020 _____

Title: Vice President, Medicaid Operations

**STATE OF NEW MEXICO**

By: David Scrase _____    Date: 4/2/2020 _____

David Scrase, Cabinet Secretary
Human Services Department

By: Danny Sandoval _____    Date: 3/31/2020 _____

Danny Sandoval, CFO
Human Services Department

**THE NEW MEXICO BEHAVIORAL HEALTH PURCHASING COLLABORATIVE**

By: Brian Blalock _____    Date: 4/6/2020 _____

Title: Cabinet Secretary, Children Youth & Families Dept

By: Kayhum Kuhul _____    Date: 4/11/2020 _____

Title: Cabinet Secretary, Department of Health

By: David Scrase _____    Date: 4/11/2020 _____

Title: Cabinet Secretary, Human Services Department

**Approved as to Form and Legal Sufficiency:**

By: Paul Ritzma _____ :    Date: 3/31/2020 _____

Paul Ritzma, Chief Legal Counsel
Human Services Department

HCSCIS_00000871

PSC 18-630-8000-0033 A2 CC 2.0

The records of the Taxation and Revenue Department reflect that the CONTRACTOR is registered with the Taxation and Revenue Department of the State of New Mexico to pay gross Receipts and compensating taxes.

**TAXATION AND REVENUE DEPARTMENT**

ID Number: 02-445429-00-0

By _Ann Marie Lucero_

DocuSigned by:
B69A7B4740C24C2...

Date: 4/13/2020

377

HCSCIS_00000872



**Blue Cross Community Centennial™**



# 2020 Member Handbook

## A Guide to Your Managed Health Care Program



ADMINISTERED BY:

  **BlueCross BlueShield of New Mexico**



bcbsnm.com/medicaid

HCSCIS_00000001


*Member Assistance*

## BCBSNM Website, Internet Help and Email

Do you need to find a provider, download the Member Handbook, view the drug list, or find forms and other plan information? Visit the BCBSNM website at bcbsnm.com/medicaid. You can also email Member Services from the website (go to Contact Us).

If you have Internet access, BCBSNM has online programs and tools you can use. Blue Access for Members℠ (BAM℠) is our secure member portal that allows you to:

- Read your Member Handbook
- Search for health care providers that participate with BCBSNM for Centennial Care - doctors, hospitals, others
- Submit a request to change your PCP
- Read frequently asked questions about your health plan
- Find health and wellness information
- Search a list for drugs that are covered by your health plan and learn about generic drugs
- Print a temporary ID or request a new ID
- Download forms
- Find Internet links to other services, important phone numbers, and email addresses
- Email BCBSNM a question or comment via secure messaging

To check out our online features and programs, log in to BAM. If you have never logged in to BAM before, click "Register Now" in the login box. Then follow the steps to register for BAM.

If you need help getting into BAM, call the Blue Access for Members Help Desk toll-free at **1-888-706-0583** (TTY: **711**). The Help Desk is available 24 hours a day, seven days a week.

We encourage you to enroll in BAM and use the online features. Programs and program rules may change or end without notice as new programs are designed and/or as your needs change.

If you have questions about your Blue Cross Community Centennial health plan, call Member Services at **1-866-689-1523**.

## What to Do in an Emergency

If there is a need for cardiopulmonary resuscitation (CPR), or there is an immediate threat to your life or limb, call 911. If there is no need to call 911, go to the nearest hospital or emergency room. Prior authorization is not needed for emergency services. You should call your PCP as soon as possible after receiving care to arrange follow-up services. See Section 4A: Physical Health Benefits for details on getting emergency care. Do not use the emergency room in a non-emergency situation. If you are a member receiving services at a Core Service Agency (CSA), you may also use your crisis plan for further instructions and contact your CSA crisis line. Before an emergency arises, please contact your assigned Care Coordinator and ask about a personal crisis plan.

HCSCIS_00000009

# Section 1: Enrollment

Remember, the sooner your local ISD office knows your baby is born, the sooner you can arrange medical services for your baby. This includes shots and well-baby checkups. If you have any questions about enrolling your baby, call your Care Coordinator at **1-877-232-5518**, option 3, then option 2. If you do not have a Care Coordinator, call Member Services at **1-866-689-1523**.

## ID Cards

Your Blue Cross Community Centennial ID card gives you the information needed for covered health care. Show your ID card to your provider when you receive services. This ID card can be used to get prescription drugs, physical health, behavioral health, long-term care, dental, and vision services. If you have Medicare or another insurance, also remember to show that card. You can also ask your provider to verify Medicaid eligibility. This can be done by the provider contacting BCBSNM or checking in the Medicaid Web Portal. Do not let anyone (other than you) use your Centennial Care ID card. If you do this, you could lose your Medicaid eligibility.

If you need to order a replacement Centennial Care ID card, you can go to bcbsnm.com/medicaid, log in to Blue Access for Members, and request a new ID card. Or you can call Member Services at **1-866-689-1523**. Your replacement ID card will be sent to you within 10 calendar days of ordering it. If you need services before your ID card arrives, log in to BAM and print a temporary ID. If you have never logged in to BAM before, follow the steps to register for BAM. If you need help getting into BAM, call the Blue Access Help Desk toll-free at **1-888-706-0583**.

## Change in Eligibility and/or Address

A lot of important information is mailed to the address you gave to the ISD office. If you change your address or phone number, it is very important to call your ISD office right away and give them your new information. Or you can go to YESNM (www.yes.state.nm.us) to update your information. Medicaid eligibility is determined based on how many people are in your family. If you have a change in family size, it is important to report this to the ISD office right away.

## When to Contact Your Local ISD Office

You need to call your local ISD office or go to YESNM (www.yes.state.nm.us) and update your information if you:

- Change your name
- Move to another address
- Change your phone number
- Have a new child, adopt a child, or place your child up for adoption
- Get other health insurance, including Medicare
- Move out of New Mexico
- Have any questions about your Medicaid eligibility

HCSCIS_00000017

# Section 2: Native Americans

## Prior Authorizations

Native American members do not need prior authorizations to visit any Indian Health Service, tribal health provider, or urban Indian provider (all together referred to as "I/T/U"). This also applies to Tribal 638 facilities. Even if these facilities and providers are out of network for Centennial Care, you can still see them. We understand the importance of your relationship with your I/T/U provider. Our Care Coordinators can help you coordinate your care with these providers.

You can receive services directly from any I/T/U provider, including facilities that are operated by Native American/Alaskan Indian tribes. You can also get prescriptions at I/T/U facilities that are not on the Drug List without obtaining prior authorization from BCBSNM.

## Care Coordinator

You can ask to be assigned to a Native American Care Coordinator.

## Native American Advisory Board

The Native American Advisory Board (NAAB) is a team of Blue Cross Community Centennial members. The members on the NAAB play a key role in advising BCBSNM how to improve its services to Native American members. NAAB meets four times a year at different locations. All Native American members are invited to attend.

You may get a phone call asking you to join us for a meeting. You can call or write us and let us know you want to join. To learn more about NAAB or to make a reservation, please call **505-816-2210** (TTY: **711**) or email **bccc_ab@bcbsnm.com**. You can visit our website at bcbsnm.com/medicaid for the most current NAAB meeting dates.

HCSCIS_00000018

# Section 3: Providers

## Making an Appointment

To make an appointment, please follow these steps:

- For routine visits or sudden illnesses, call your provider's office and tell them you are a Centennial Care member. Your provider's office will help you.

- When you get to the provider's office, show your Centennial Care ID card. If you have a Medicare or other insurance ID card, please be sure to show that as well.

- You may contact your Core Service Agency (CSA) or other behavioral health provider for an appointment for routine or urgent needs.

- You may also contact your assigned Care Coordinator if you need assistance.

- If you need a ride to your provider's office or behavioral health appointment please call LogistiCare.

If you go to a provider's office without an appointment, the provider may not be able to see you. Please call your provider before you go to his or her office.

We do not guarantee that a certain type of room or service will be available at any hospital or other facility within the Centennial Care provider network, or that the services of a particular hospital, provider, or other provider will be available.

## Transportation to Appointments

If you do not have a car or anyone to give you a ride, you may be eligible for transportation to help you get to your non-emergency medical, behavioral, and long-term care appointments. LogistiCare coordinates all non-emergency transportation for Centennial Care members. This includes food and lodging expenses when you have to travel a long distance to get covered medical care. Call LogistiCare

at least three working days before your routine appointment to schedule a ride. More information about LogistiCare is provided in the section regarding non-emergency transportation services. See Section 4: Covered and Non-Covered Benefits for more information on transportation services.

## Second Opinions

Getting a second opinion means seeing another provider about your illness or your treatment after your own PCP or specialist has seen you. You have a right to see another provider if:

- You disagree with your PCP or specialist

- You have more concerns about your illness

- You want another provider to approve your treatment plan

- You need more information about treatment than your provider has suggested

- Your PCP or specialist does not want to give you a referral to another provider who requires that you have a referral

You must get your second opinion from providers who are in the Centennial Care network or get a prior authorization from BCBSNM to see a provider outside the network. We will cover a second opinion from a qualified provider outside the network at no cost to you only if one is not available in our network. You must have prior authorization from BCBSNM before getting a third or fourth opinion.

HCSCIS_00000024

# Section 4: Covered and Non-Covered Benefits

If this happens, BCBSNM has the following rights:

- Right to reimbursement for all benefits provided from any and all damages collected from the third party for those same expenses whether by action at law, settlement, or compromise, by the Member or the Member's legal representative as a result of that sickness or injury, in the amount of the total Covered Charges for Covered Services for which BCBSNM has provided benefits to the Member.

- BCBSNM is assigned the right to recover from the third party, or his or her insurer, to the extent of the benefits BCBSNM provided for that sickness or injury.

- BCBSNM shall have the right to first reimbursement out of all funds the Member, the Member's covered family Members, or the Member's legal representative, are or were able to obtain for the same expenses for which BCBSNM has provided benefits as a result of that sickness or injury.

- The Member is required to furnish any information or assistance or provide any documents that BCBSNM may reasonably require in order to obtain our rights under this provision. This provision applies whether or not the third party admits liability.

If you have both Medicare and Medicaid, you have more than one insurance coverage. Medicare is considered your primary insurance and Centennial Care is your secondary insurance. Your Centennial Care benefits will not change your primary insurance benefits. If you have a care coordinator, they will work with your primary insurance to help set up your health care. If you do not have a Care Coordinator, call Member Services at **1-866-689-1523** and they will be able to help. If you have both Medicare and Centennial Care, Medicare Part D will cover most of your drugs. You will still have to pay Medicare Part D copays unless you live in a nursing facility. If you have Medicare, you can use your current provider. You can get Medicare specialty services without approval from BCBSNM. We will work with your provider for the services you get. We can help you pick a provider if you do not have one. This provider can set up your Centennial Care and Medicare services. Centennial Care may cover some services that are not covered by Medicare.

HCSCIS_00000028

# Section 4A: Physical Health Benefits

## Preventive Services

Preventive health care is for everyone. Preventive health care can keep you healthy and prevent illness. Below are some of the screenings and services available to you and your children.

## Well-Child Visits

Well-child visits are for children from birth to age 21. Your child's PCP can check your child's health, growth, development, and provide immunizations. This can occur many times throughout childhood. Well-child visits can sometimes be done when your child sees the PCP for a sick visit.

Your PCP will guide you if more services are needed.

## Early and Periodic Screening, Diagnostic, and Treatment (EPSDT)

EPSDT services are provided to every Medicaid-eligible child from birth to age 21. Centennial Care wants your child to be healthy. Centennial Care will provide checkups and preventive services through your child's regular provider. A well-child checkup will be provided for your child. Your child should have exams at the ages shown on the chart below.

| Well-Child Health Check Schedule with your PCP | |
|---|---|
| Under age 1 | 3 – 5 days, 1 month, 2 months, 4 months, 6 months, and 9 months |
| Ages 1 to 30 months | 12 months, 15 months, 18 months, 24 months, and 30 months |
| Ages 3 to 21 years | Each year |

These exams may include vaccinations or shots. If your child has not had his or her checkup this year, call the provider and schedule one.

- Lead Testing: The provider will need to do a blood test to make sure your child does not have too much lead. Your child should be checked at 12 months and 24 months of age or if they have never been checked.
- Dental Exam: Your child should have their teeth cleaned and receive fluoride treatments every six months.
- Private Duty Nursing: When your child's provider wants a nurse to provide care at home or at school.
- Personal Care Services: When your child's provider wants a caregiver to help your child with eating, bathing, dressing, and toileting.

EPSDT also provides hearing services, vision services, school-based services, and more. If you have questions, please contact your Care Coordinator. If you need a Care Coordinator, call **1-877-232-5518**, select option 3.

Health problems should be identified and treated as early as possible. When your child needs assistance with daily activities due to a qualifying medical condition, special services like Private Duty Nursing or Personal Care Services will be provided under EPSDT through Centennial Care.

Immunizations help keep you well. You can receive shots at a PCP visit. Many immunizations are needed before the age of two years. Yearly flu shots are important, too. Ask your PCP which shots you need. Teenage children will also need to receive some shots.

HCSCIS_00000032

# Section 4B: Behavioral Health Benefits

Behavioral health services help to support people facing emotional problems, mental health conditions, and/or substance abuse. Sometimes, behavioral health conditions may occur in combination with each other, or in addition to a physical condition. Covered services are services paid for by Centennial Care. The type of service you may need depends on your situation. A Care Coordinator can help you find out what services are covered for you and whether the service will need prior authorization. To learn more about prior authorizations, please see page 22 of this handbook. If you need a Care Coordinator, call **1-877-232-5518**. A list of covered services available for the behavioral health benefit on the Standard Medicaid Plan and Alternative Benefit Plan (ABP) is included in the table on the following pages. The "✓" in the column will tell you if the service(s) are covered for the Standard Medicaid Plan and the ABP.

The ABP is a part of the New Mexico Medicaid Centennial Care program. The ABP offers coverage for Medicaid-eligible adults ages 19-64 who have income up to 138% of the Federal Poverty Level (FPL), which includes the Medicaid Expansion Population and Transitional Medical Assistance categories. If you are eligible for ABP covered services, please refer to the services listed under the column titled, "ABP Covered Service."

If you are an ABP member and have a physical or behavioral health condition that meets certain criteria, you may be eligible for covered services under the column titled, "Standard Medicaid Plan Covered Service."

HCSCIS_00000044

# Section 4B: Behavioral Health Benefits

You do not need a referral from your PCP to get behavioral health services. You can call Member Services at **1-866-689-1523** to get more information. If you are not sure what kind of help you need, call Member Services and they will help you find a provider or help you speak to a Care Coordinator. You may need to complete an assessment with the help of your Care Coordinator and meet certain conditions to get behavioral health services. A licensed clinician may need to determine that the services are medically necessary.

If you do not have a personal crisis plan, please talk to your behavioral health provider or call the 24/7 Nurseline at **1-877-213-2567**. It is important that you make a plan in advance that may help you prevent crisis or relapse.

In an emergency, (such as if you feel like hurting yourself or others, or if you are not able to take care of yourself), call 911 or go to the nearest hospital emergency room.

## What is Not Covered for Behavioral Health Benefits

Non-covered services are the services not paid for by Centennial Care. These services would be paid for by you. Call Member Services at **1-866-689-1523** for more information about if a service is covered or not covered.

Centennial Care does not cover the following behavioral health services:

- Activity therapy, group activities, and other services that are primarily recreational in nature
- Biofeedback

- Conditions that do not meet the standard of medical necessity as defined in Centennial Care rules
- Educational or vocational services related to traditional academic subjects or vocational training
- Experimental or investigational procedures, technologies, or non-drug therapies and related services
- Hypnotherapy
- Services for which prior authorization is required but was not obtained
- Services provided by a behavioral health practitioner who is not in compliance with Centennial Care rules or renders services outside their scope of practice
- Services not considered medically necessary for the condition of the eligible recipient
- Treatment greater than 15 days a month in Institutions for Mental Disease (IMD) for members between the ages of 22 and 64
- Treatment of intellectual disabilities alone

## Certified Peer Support Workers

Certified Peer Support Workers (CPSWs) provide a bridge between you and your Care Coordinator. They work with different agencies to develop a bond to help you and your family use resources that benefit you.

You can call Member Services at **1-866-689-1523** (TTY: **711**) to receive helpful information on how to contact a behavioral health CPSW or wellness center.

HCSCIS_00000047

# Section 4C: Long-Term Care and Community Benefits

Your Centennial Care plan covers long-term care services. Long-term care includes medical and non-medical care for people who have disabilities or long-lasting illnesses. Long-term care helps meet health or personal needs. Most long-term care is to help people with support services such as activities of daily living like dressing, bathing, and using the bathroom. Long-term care can be provided in the home, in the community, in assisted living, or in the nursing home. It is important to remember that you may need long-term care at any age.

If your care requires it, coverage is available for nursing facilities and swing bed hospital services. Prior authorization is required. If you live in a nursing home and want to move out, we want to help you find a place that is right for you. Please call your Care Coordinator to learn more about the Community Benefit. This benefit offers the same needed care services at home for members who are eligible for nursing facility services.

You may be eligible for the Community Benefit based on Medicaid eligibility requirements or through eligibility based on medical need as determined on program availability through HSD/MAD.

If you do not utilize Community Benefit Services for 90 consecutive calendar days, it could result in you no longer being able to access Community Benefit Services or a loss of Medicaid eligibility.

To determine if you meet the Medicaid eligibility requirements, your Care Coordinator will do an assessment of your level of care. If the assessment shows you need a nursing facility level of care, you will be eligible for the Community Benefit.

If you are eligible for the Community Benefit, you will have the option to select either the Agency-Based Community Benefit (ABCB) or the Self-Directed Community Benefit (SDCB).

HCSCIS_00000048

# Section 4C: Long-Term Care and Community Benefits

## Agency-Based Community Benefit

You will need to work with your Care Coordinator, based on your comprehensive needs assessment, to coordinate your care.

## What is Not Covered for Agency-Based Community Benefit Services

Certain procedures, services, or miscellaneous items are not covered under the ABCB plan. To get more information on what is not covered, please contact your Care Coordinator for more information.

## Self-Directed Community Benefit

The SDCB is certain Home and Community-Based Services that are available to eligible members meeting nursing facility level of care. Self-direction gives you the opportunity to have choice and control over how your Community Benefits services are provided. You can also choose who provides the services and how much providers are paid in accordance with SDCB-approved rates.

## Your Participation

If you choose SDCB, you must participate in the ABCB for a minimum of 120 calendar days before you can switch to SDCB. When you switch over to SDCB, you will need an Employer of Record (EOR), Care Coordinator, and Support Broker. You can be the EOR or designate someone on your behalf. The EOR, with assistance from the Support Broker and Care Coordinator, will be responsible for the following activities:

- Managing a self-directed budget
- Recruiting, hiring, and supervising providers
- Developing job descriptions for direct supports

- Completing employee forms
- Approving timesheets and purchase orders
- Getting quotes for services
- Completing all required documentation
- Developing a back-up plan
- Attending training
- Reporting incidents, such as fraud and abuse

## Support Broker

A Support Broker provides support to you or your family in arranging, directing and managing your SDCB services. The Support Broker supports, as well as develops, monitors, and implements your SDCB care plan and budget.

A Support Broker will be available to help you make sure you meet all of the requirements. To get a Support Broker, call a Care Coordinator at **1-877-232-5518**.

## Recruiting, Hiring, Supervising, and Firing Providers

The EOR is the person responsible for directing the work under the SDCB. The EOR will recruit, hire, and fire all employees. The EOR will make all work schedules and assign tasks. The EOR will supervise and give training to all employees.

When the EOR works with employees, they will set how much employees will be paid. The payment rates must stay within the set range of rates. The EOR must:

- Track money spent on paying employees
- Track money spent on goods and services
- Approve employee time sheets

The EOR cannot be paid for doing the EOR tasks.

HCSCIS_00000051

# Section 5: Alternative Benefit Plan

The Alternative Benefit Plan (ABP) is a part of the New Mexico Medicaid Centennial Care program. The ABP offers coverage for Medicaid-eligible adults ages 19-64 who have income up to 138% of the Federal Poverty Level (FPL), which includes the Medicaid Expansion Population and Transitional Medical Assistance categories.

There are two kinds of ABP benefit packages.

## ABP Benefit Package

If you are eligible for the ABP benefit package, all of the detail outlined in this member handbook applies to you except for some of the covered and non-covered services. Value-added services are also different. To find out if a service is covered, you can check the covered services in Sections 4A – 4G or call Member Services at **1-866-689-1523**.

## ABP Exempt Benefit Package

If you are an ABP member and have a physical or behavioral health condition that meets certain criteria, you may be eligible to move to the Expansion State Plan. This is also called ABP Exempt. Examples of the criteria are listed below:

- Individuals who qualify for medical assistance on the basis of being blind or disabled
- Individuals who are terminally ill and are receiving benefits for hospice care
- Pregnant members
- Individuals who meet Medically Frail Criteria; to learn more about Medically Frail Criteria, call Member Services at **1-866-689-1523** or ask your Care Coordinator

You may meet the Medically Frail Criteria if you have one of the following conditions:

- Disabling mental disorder, including individuals up to age 21 with serious emotional disturbances and adults with serious mental health condition
- A continuing substance use disorder
- A serious medical condition
- A disability that weakens your ability to perform one or more activities of daily living
- A disability determination based on Social Security criteria

Your condition will be reviewed by a Care Coordinator to see if you meet these criteria. You can also call us to ask us to complete this review at any time if you think you meet the criteria for ABP Exempt. BCBSNM will let you know of your exempt status within 10 business days. If you do not have a Care Coordinator, please call Member Services at **1-866-689-1523** (TTY: **711**).

If you meet criteria and choose to move to the ABP Exempt benefit package, you will then have the same benefits and provider network as the standard Medicaid plan. This means that everything in this handbook about standard Medicaid, except value-added services, also applies to you. If you meet ABP Exempt criteria during the middle of the month, you will be moved to that plan the 1st of that same month.

Under the ABP Exempt benefit package, you can also access community benefits and nursing facility care when the requirements for those services are met. To determine if you meet the Medicaid eligibility requirements, your Care Coordinator can do an assessment of your level of care. If the assessment shows you need a nursing facility level of care, you will be also be eligible for the Community Benefit.

HCSCIS_00000068

# Section 6: Care Coordination

## Considering Your Needs

To give you extra help getting appropriate care when and where you may need it, we have a number of programs to help you. The first step is to work with you to perform a Health Risk Assessment sometimes called an HRA. We will call you on the phone to ask health questions. These questions help us assist you with any needs related to your health condition. Our goal is to work with you to develop a care plan based on your needs and preferences.

BCBSNM will look at your completed Health Risk Assessment, to identify your medical, long-term care, and behavioral health needs. BCBSNM will then assign you to the right Care Coordination level to help you.

## Care Coordination Levels

**Level 2:** You will have a Care Coordinator who will work directly with you. Your Care Coordinator will be in contact with you to conduct a Comprehensive Needs Assessment (CNA). We use this assessment to help connect you with providers who can help with your identified needs. It will happen in person in your home. Your Care Coordinator will be in contact with you often to monitor your care plan and provide you education on concerns you may be dealing with.

**Level 3:** You will have a Care Coordinator who will work directly with you. This Care Coordinator knows a lot about special health needs. Your Care Coordinator will contact you to conduct a CNA in person with you. This assessment helps us make sure you are getting all the care you need from the right providers. It will happen in person in your home. Your Care Coordinator will be in contact with you often to monitor your care plan. You can talk to your Care Coordinator about any education you may need to help you with your illness.

If your medical health, behavioral health, or long-term needs change, or if you are in the hospital, please contact your Care Coordinator. This is also referred to as reporting a change in health status. Keep in touch with your Care Coordinator and let them know if your phone number or address changes. This helps your Care Coordinator give you the assistance you need. If you do not have a Care Coordinator and need help with your care, please call Care Coordination at **1-877-232-5518** and select option 3.

HCSCIS_00000070

# Section 6: Care Coordination

## Care Coordination

Care Coordination is a service that provides extra help to members with special health care needs, whether at home, in a skilled facility, or in the hospital. Care Coordination focuses on you, the member, and when appropriate, your family. It is sensitive to your cultural background. Care Coordination can help you better identify your health care needs. It also helps you get appropriate services. This includes coordination of services between doctors in our Blue Cross Community Centennial network as well as out-of-network doctors, as appropriate. This includes your medical, behavioral, and long-term needs.

Care Coordination includes Complex Case Management and Disease Management. You may have a chronic condition such as childhood asthma or adult diabetes, a complex condition, or several health conditions, which might include mental health or substance use. BCBSNM's Care Coordinators can work with you and your provider to manage your condition(s). At a time that can be very stressful, our care coordinators can assist you with: understanding your medical condition/diagnosis and treatment plans, communicating with your providers to coordinate your care, getting the health benefits to which you are entitled, and finding health care services based on your condition(s). Your caregiver or your provider can refer you to the program or you can self-refer. You can end the program at any time.

If you have special needs, BCBSNM will assign you a Care Coordinator who speaks your preferred language and is responsible for coordinating your health care services by:

- Giving you information about providers in BCBSNM's network who may address those needs

- Coordinating medical, behavioral, and long-term care services
- Assisting in coordinating care when you also have Medicare or other coverage
- Getting help with different appointments, non-emergency transportation, or other needs; or getting community services not covered by Centennial Care
- Making sure care coordination is provided when needed

You can call your Care Coordinator at **1-877-232-5518** to discuss your medical, behavioral, and long-term care needs. Call **711** for TTY service.

## Getting Help with Special Health Care Needs

Some members need extra help with their health care. They may have long-term health problems and need more health care services than most members. They also may have medical, behavioral, or long-term care problems that limit their ability to function. We have special programs to help members with special health care needs.

If you believe you or your child has special health care needs, please call a Care Coordinator at **1-877-232-5518** and select option 3. The Care Coordinator can provide you with a list of resources to help you with your special needs. We also provide education for members with special health care needs and their caregivers. Information is provided about how to deal with stress and/or a chronic illness.

HCSCIS_00000071

# Section 9: General Information

## Changes to Handbook or Benefits

HSD/MAD reserves the right to add or delete benefits to the Centennial Care program.

## Disclosure and Release of Information

BCBSNM will only disclose information, including medical records, as permitted or required under state and federal law.

## Accessing your Medical Records

Your health information may be available online through your patient portal. This is a secure website through your doctor's office or health care system. Using a secure user name and password, you can log in and view some of your health information such as:

* Recent doctor visit notes
* Discharge summaries
* Lab and test results
* Medications
* Immunizations
* Allergies
* Online prescription refills
* Online appointment scheduling
* Secure messaging with your provider

Your patient portal may allow you to download this information or share it with others. If this information is not available, you can request it from your doctor's office. You may have more than one patient portal for all the places you receive care. Like your primary care physician, a hospital, your specialists, your pharmacy, laboratories, or your insurance provider.

## Advance Directives

Advance directives are written documents (such as a Living Will, Health Care Treatment Directives, and Durable Power of Attorney) that give a person you select the responsibility for making your health care decisions if you cannot express your own wishes. These documents also describe the kind of treatment you do and do not want. Talk with your provider about advance directives. Keep a copy of your advance directives in your medical record at your PCP's office. Members over age 18 or emancipated minors have the right to refuse or accept medical or surgical care and to make advance directives.

BCBSNM, in-network providers, and staff do not discriminate care based on whether you have signed any type of advance directive. If you have questions or concerns about advance directives, contact your PCP to discuss these issues.

Complaints about noncompliance with advance directive requirements may be filed with HSD/MAD Division of Health Improvement in the New Mexico Department of Health.

Federal law says hospitals, nursing homes, and other providers have to tell you about advance directives. They need to explain your legal choices about medical decisions. The law was made to give you more control during times when you may not be able to make health care decisions.

If you need help to get an advance directive, contact Member Services or your Care Coordinator. If you are speech or hearing impaired, call 711 for TTY service. You can also call the State of New Mexico Aging and Disability Resource Center at **1-800-432-2080**.

HCSCIS_00000084

# Section 9: General Information

## Mental Health Advance Directives

New Mexico's Mental Health Care Treatment Decisions Act allows you to put in writing your wishes for psychiatric treatment. This is called a Psychiatric Advance Directive (PAD). If you are unable to make a decision, mental health advance directives will describe your wishes. You can list a person you trust to make decisions for you. If you need help to get an advance directive, contact Member Services or your Care Coordinator.

## Major Disasters

In the event of any major disaster, epidemic, or other circumstance beyond your control, BCBSNM will render or try to arrange covered services with in-network providers as much as possible. BCBSNM will do this according to its best judgment and within the limitations of facilities, supplies, pharmaceuticals, and personnel available. Such events include, complete or partial disruption of facilities, war, riot, civil uprising, disability of BCBSNM personnel, disability of Centennial Care providers, or an act of terrorism.

## Women's Health and Cancer Rights Act of 1998

As required by the Women's Health and Cancer Rights Act of 1998, BCBSNM provides benefits for mastectomy-related services, including reconstruction and surgery to achieve symmetry between the breasts, prostheses, and treatment of complications resulting from a mastectomy (including lymphedema). If you have any questions, please call, write, or email Member Services.

## Health Care Fraud and Abuse

Health care fraud, waste and abuse hurts everyone by causing higher costs, receiving inappropriate medical services and/or supplies, and creating distrust within the medical community.

**Definitions:**

- Fraud means an intentional deception or misrepresentation by a person or an entity, with the knowledge that the deception could result in some unauthorized benefit to himself or some other person. It includes any act that constitutes Fraud under applicable federal or State law.

- Waste means the over-utilization of services or other practices that result in unnecessary costs

- Abuse means any intentional, knowing or reckless act or failure to act that produces or is likely to produce physical or great mental or emotional harm, unreasonable confinement, sexual abuse or sexual assault. Provider practices that are inconsistent with sound fiscal, business, medical or service-related practices and result in an unnecessary cost to the Medicaid program, or in reimbursement for services that are not Medically Necessary Services or that fail to meet professionally recognized standards for health care. Abuse also includes member practices that result in unnecessary cost to the Medicaid program

What you can do to prevent yourself from being a victim to health care fraud:

- Understand your treatment program; ask your physician to explain why a test or procedure is necessary

- Never use someone else's health insurance identification card

- Don't share your health insurance information with anyone over the phone

HCSCIS_00000085